Fairbrook Leasing, Inc., et al. v. Mesaba Aviation, Inc.
Summons and Complaint

SCANNED

AUG 1 3 2004

U.S. DISTRICT COURT MPLS

Exhibit A

## TERM SHEET PROPOSAL
## FOR THE ACQUISITION OF SAAB 340 AIRCRAFT BY
## MESABA AVIATION, INC.

BUYER/SUBLESSEE:       Mesaba Aviation, Inc. ("Mesaba")

SELLER:                Saab Aircraft of America, Inc. ("SAAI")

SUBLESSOR:             Fairbrook Leasing, Inc. ("FLI")

POTENTIAL ASSIGNEE: Northwest Aircraft Inc. ("NAI")

NAI GUARANTOR:         Northwest Airlines, Inc. ("NWA")

FIRM AIRCRAFT:         Thirty (30) new Saab 340B*Plus* aircraft ("New
                       Aircraft") and twenty (20) used Saab 340A
                       aircraft ("340A Aircraft")

OPTION AIRCRAFT:       Ten (10) new Saab 340B*Plus* aircraft ("Option
                       New Aircraft"), and twelve (12) used Saab 340A
                       aircraft ("Option 340A Aircraft")

### SUMMARY

SAAI proposes to sell thirty (30) New Aircraft to Mesaba, in
six (6) "Groups" of five (5) aircraft each.  Mesaba will also
acquire options for ten (10) Option New Aircraft, in two (2)
Groups of five (5) aircraft each.  FLI will provide, and Mesaba
will utilize, sublease financing for all Groups (except that for
one Group in 1997 and one Group in 1998, Mesaba may elect to
purchase the Aircraft from SAAI for a fixed price, and may, at its
option, then utilize debt financing to be arranged by FLI.)

FLI proposes to sublease twenty (20) 340A Aircraft to Mesaba,
subject to existing subleases.  Mesaba will also acquire options
for twelve (12) Option 340A Aircraft.

Under certain circumstances, Mesaba may assign to NAI its
rights to purchase, sublease or debt-finance Aircraft.

### NEW AIRCRAFT COMMERCIAL TERMS

DOCUMENTATION:         The primary agreement is the Saab 340B
                       Aircraft Acquisition Agreement dated as of
                       March 1, 1996 between Mesaba and SAAI (the
                       "Acquisition Agreement"), as supplemented by
                       ten "Exhibits" and four "Letter Agreements".

SPECIFICATION:         Thirty (30) New Aircraft, built to Saab 340B
                       Type Specification 72PJS0329, Revision D dated
                       August 1995 (Exhibit B), with the optional
                       equipment selected by Mesaba and listed in
                       Exhibit C, including active noise system, cold
                       weather kit, leather seat covers,

*Schroder* Ex __1__
For ID/In EV.
Nancy R. Sullivan
Date: 1-3-03

**EXHIBIT A**

supplementary cabin cooling and heating systems, TCAS II and the Universal global positioning system ("GPS").  Until certification for factory installation (expected before January 1, 1997) is obtained, New Aircraft will be completely provisioned for the Universal GPS, and SAAI will supply to Mesaba, at no additional cost to Mesaba, the components for Mesaba to install post-delivery.

DELIVERY SCHEDULE: To be determined, based on the provisions of Annex 1.

DELIVERY LOCATION: Mesaba's facility in either Minneapolis, Minnesota or Detroit, Michigan, as specified by Mesaba for any particular New Aircraft or Option New Aircraft.  Mesaba shall indemnify SAAI for any state and local sales and use taxes.  Mesaba shall provide positive space travel back to Sweden for three (3) crew members who deliver each Aircraft.

PRICING: The purchase price for each New Aircraft is $7,685,000 and is not subject to escalation. Mesaba will pay SAAI Advance Payments of $50,000 per New Aircraft upon the signing of this Term Sheet, and an additional $50,000 per New Aircraft upon execution and delivery of the Acquisition Agreement, for a total of $100,000 in Advance Payments per New Aircraft and an aggregate Advance Payment for New Aircraft of $3,000,000.

METRO III
TRADE-INS: An affiliate of SAAI will assume the operating lease payment obligations for the seven (7) Metro III aircraft operated by Mesaba and identified in Letter Agreement No. 1, on a one-for-one basis as the first seven (7) New Aircraft are delivered to Mesaba.

SPARE PARTS
CREDITS: As more fully described in Letter Agreement No. 2, on the date the Acquisition Agreement becomes fully effective, SAAI will grant Mesaba Spare Parts Credits in the aggregate amount of $17,600,000, applicable toward the purchase of aircraft and propeller spare parts from SAAI, and available for Mesaba's use as described in Letter Agreement No. 2.  If Mesaba has not taken delivery of all thirty (30) New Aircraft and all twenty (20) 340A Aircraft by December 31, 1998, then SAAI will cancel Spare Parts Credits in the amount of $352,000 for each such undelivered Aircraft.



2

In addition, SAAI shall provide Mesaba with six (6) new and four (4) reconditioned, servicable, zero-time spare propellers, at no additional cost to Mesaba, on a schedule reasonable for the support of Mesaba's Saab 340 fleet as it increases in size.

**SPARE PARTS DISCOUNT:**

Mesaba shall be entitled to a discount of 25% off the standard catalog list price for the purchase of spare parts (including propeller spare parts) from SAAI, as provided in Letter Agreement No. 2, Paragraph 2.

**EXTENDED WARRANTY:**

The aircraft parts warranty and the airframe design warranties provided in Exhibit F will be extended from 24 to 36 months (without regard to time or cycles flown), as stated in Letter Agreement No. 1, Paragraph 2.

**MATERIALS COST GUARANTEE:**

SAAI will provide a materials cost guarantee covering all Saab 340A and 340B aircraft operated by Mesaba and acquired from SAAI or its affiliates, for a period of five (5) years after the delivery of the first 340A Aircraft to Mesaba.  This guarantee (which is set forth in Attachment A to Letter Agreement No. 2) provides that SAAI would pay a specified portion of any excess of Mesaba s cost of specified maintenance materials for its Saab fleet, to the extent such costs exceed $80 per flight hour (as adjusted from a base month of January 1996 according to Appendix A to Attachment A to Letter Agreement No. 2).

**TRAINING:**

The training programs for pilots and mechanics described in Exhibit G, Section 4 will be provided for up to thirty (30) of Mesaba's pilots (the initial training cadre) and up to seventy-five (75) of Mesaba's mechanics, and SAAI will also provide Mesaba, at no additional cost to Mesaba, with fifteen (15) hours of simulator time (with Mesaba instructor) for each of up to three hundred fifty (350) of Mesaba's pilots, all as stated in Letter Agreement No. 2, Paragraphs 5 and 6. In addition, SAAI will provide, at no additional charge, flight attendant training for up to six (6) classes of students and instructors, and will provide information on the Saab 340 aircraft in support of Mesaba's development of its own training materials.

**SIMULATOR DATA AND PARTS:**

As more fully described in Letter Agreement No. 2, Paragraph 4, SAAI will provide to Mesaba, at no additional cost to Mesaba, a

3

data package for a Saab 340 Level D simulator. In addition, SAAI will permit Mesaba to apply Spare Parts Credits and its spare parts discount toward the purchase of aircraft-related parts for the simulator, as stated in Letter Agreement No. 2, Paragraphs 1(b) and 4.

PARTS LEASES: SAAI and Mesaba will agree on a list of insurance spare parts with a value not to exceed $3,000,000 (the "Lease Spares"). Subject to requirements of other Saab 340 operators from time-to-time, SAAI agrees to keep the Lease Spares on hand at its U.S. facility. During the first ten (10) years after the Delivery Date of the first 340A Aircraft to Mesaba, should Mesaba need to lease one or more of the Lease Spares to cover a temporary requirement, SAAI will provide such Lease Spares (if available) on lease at no rental charge to Mesaba, to a maximum free-of-charge period of thirty (30) days for each such instance.

TECH REPS: Notwithstanding Section 2.a of Exhibit G, SAAI agrees to assign and locate one (1) Field Technical Representative each at Mesaba's Detroit and Minneapolis facilities, each for twelve (12) months (for a total of twenty-four (24) rep-months) from the commencement of Saab 340 operations at such facility. Thereafter for thirty-six (36) months, SAAI agrees to assign one (1) Field Technical Representative to Mesaba, for a total commitment of sixty (60) rep-months.

SERVICE BULLETINS AND ADs: SAAI agrees to provide, free of charge to Mesaba (except for shipping charges), all airframe parts (other than vendor parts covered by a "power-by-the-hour" program) required for compliance with (1) any mandatory Service Bulletin or FAA Airworthiness Directive applicable to New Aircraft that must be complied with on or before May 1, 2000 and (2) any mandatory Service Bulletin or FAA Airworthiness Directive applicable to Saab 340A or Saab 340B model aircraft involving operation in icing conditions that are issued on or before May 1, 2000 and that must be complied with on or before May 1, 2001.

OPTION NEW AIRCRAFT: As more fully described in Letter Agreement No. 4, ten (10) new Saab 340BPlus aircraft built to the same specification as the New Aircraft, with the same optional equipment. The purchase price is the same as for the New

4

Aircraft, except that it is subject to adjustment for changes in the Consumer Price Index from January 1, 1997 (subject to a maximum increase of 4% per year).

OPTION TERMS:    Mesaba will pay SAAI a refundable Option Fee of $20,000 per Option New Aircraft, $10,000 to be paid upon the signing of this Term Sheet and $10,000 upon the execution and delivery of the Acquisition Agreement, for an aggregate Option Fee for Option New Aircraft of $200,000. Mesaba must exercise its option to purchase the Option New Aircraft on or before December 31, 1998. The first Option New Aircraft will be delivered in the month that is nine (9) months after the month following Mesaba's exercise of its option, with the remaining delivery schedule to be mutually agreed, but at a rate not to exceed a total of two (2) Option New Aircraft and Option 340A Aircraft per month. Mesaba must pay SAAI an Advance Payment of $100,000 per Option New Aircraft at the time it exercises its option to purchase each Option New Aircraft.

## NEW AIRCRAFT FINANCING OPTIONS AND TERMS

DOCUMENTATION:    The primary agreement is the Financing Agreement for Saab 340A and 340B Aircraft dated as of March 1, 1996 between Mesaba and FLI (the "Financing Agreement"), which is supplemented by seven Exhibits, among which are the agreed forms of lease and sublease for New Aircraft and Option New Aircraft (each referred to below, for convenience only, as a "Sublease"). The following is a summary of selected elements of the Financing Agreement that apply to New Aircraft and Option New Aircraft:

COMMITMENTS OF
FLI AND MESABA:    FLI shall provide, and Mesaba shall utilize the Sublease financing described more fully in Section 5(a), for all Groups of New Aircraft and Option New Aircraft, unless it notifies FLI at least ninety (90) days in advance of the scheduled delivery month of the first New Aircraft or Option New Aircraft in such Group that it elects to purchase the Aircraft in that Group from SAAI as provided in the Acquisition Agreement; but (as described in Letter Agreement No. 4, Paragraph 3) Mesaba may elect to so purchase no more than one of Groups 2, 3 and 4 and no more than one of Groups 5, 6, 7 and 8.

5



DEBT FINANCING:        If Mesaba does elect to so purchase a Group,
                       then it may also require FLI to provide or
                       arrange senior secured debt financing or
                       leveraged lease debt financing for all
                       Aircraft in such Group, as more fully
                       described in Section 5(b).   In connection with
                       any such financing arranged by Mesaba or NAI,
                       FLI will provide a 25% residual value
                       guarantee at the end of the seventeen (17)
                       year term.

TERM OF SUBLEASES:     The term of each Sublease will be seventeen
                       (17) years; at FLI s option such term for any
                       Aircraft may be increased by the addition of a
                       stub period of up to three (3) months between
                       its delivery and the commencement of a
                       permanent Sublease.

BASIC RENT:            For New Aircraft, Basic Rent will be $59,970
                       per month, in advance; except that the Basic
                       Rent for each New Aircraft delivered prior to
                       March 1, 1997 shall be $44,000 per month, in
                       advance, for the first three (3) months of its
                       lease term.   For Option New Aircraft, Basic
                       Rent shall be subject to adjustments based
                       upon the changes in the Consumer Price Index
                       from January 1, 1997 (subject to a maximum
                       increase of 4% per year), and to changes in
                       the ten (10) year U.S. Treasury rates compared
                       to February 28, 1996.

## 340A SUBLEASE FINANCING TERMS

DOCUMENTATION:         The primary agreement is the Financing
                       Agreement.   The Sublease for each 340A
                       Aircraft and Option 340A Aircraft shall be in
                       the form of Exhibit D to the Financing
                       Agreement, subject to changes (as provided in
                       Section 5(a)(v)) required for conformance with
                       the Head Lease in effect with respect to such
                       Aircraft.   The following is a summary of
                       selected elements of the Financing Agreement
                       that apply to 340A Aircraft and Option 340A
                       Aircraft:

COMMITMENTS OF
FLI AND MESABA:        As more fully described in Sections 3(a) and
                       4, FLI shall deliver to Mesaba, and Mesaba
                       shall sublease from FLI, twenty (20) 340A
                       Aircraft, and Mesaba will pay FLI, upon the
                       signing of this Term Sheet, $25,000 per 340A
                       Aircraft, for a total of $500,000, in Advance
                       Payments.

SPECIFICATION:         As more fully described in Annex 2 hereto
                       (which supersedes Exhibit C to the draft

6

Financing Agreement), the 340A Aircraft will be configured with 34 seats, forward galley and aft lavatory, with cold weather kit, leather seat covers, TCAS II and supplementary cabin heating system. (Section 3(d)). SAAI shall supply, at no additional cost to Mesaba, the components of a Universal GPS to Mesaba, and Mesaba shall install the GPS on each 340A Aircraft (including Option 340A Aircraft).

DELIVERY SCHEDULE: To be determined, based on the provisions of Annex 1.

DELIVERY LOCATION: At the facility where each Aircraft has been refurbished or another, mutually agreed location so as to minimize the tax impact of such delivery. Mesaba shall indemnify FLI for any state and local sales or use taxes. Mesaba's pilots shall ferry each Aircraft from the refurbishment facility to the delivery location and then to Mesaba's operations base, but FLI will assist Mesaba by providing pilots for as many as the first three (3) deliveries, until Mesaba has trained sufficient pilots on the Saab 340 to reasonably accommodate such delivery flights.

TERM OF SUBLEASES: At FLI's option, and depending on the remaining term of the applicable Head Lease, the term of each Sublease will be between 72 and 96 months (Section 5(a)(ii)), with best efforts to obtain four (4), one (1) year extensions at the same Basic Rent.

BASIC RENT: $44,000 per month, in advance (Section 5(a)(iii)).

OPTION 340A
AIRCRAFT: As many as twelve (12) Option 340A Aircraft, offered in an initial set of five (5) aircraft ("Group A") and a second set of seven (7) aircraft ("Group B"). The Option 340A Aircraft will have the same specification, Sublease term and Basic Rent as the 340A Aircraft. The earliest delivery date for the first Option 340A Aircraft will be in the month after the scheduled delivery month of the 30th New Aircraft (and no sooner than six (6) months after the month in which the option was exercised), with remaining delivery schedule to be mutually agreed, but at a rate not to exceed two (2) Option New Aircraft and Option 340A Aircraft per month, subject, only in the case of Group B Option 340A Aircraft, to such aircraft being "Available" as defined in Section 3(a) of the Financing Agreement.

The option to sublease either Group must be
exercised no later than December 31, 1998.
The option to sublease Group B cannot be
exercised unless Mesaba has also exercised its
option to acquire all of the Option New
Aircraft.

## RIGHTS ASSIGNABLE TO NORTHWEST AIRCRAFT AND NORTHWEST AIRLINES

PURCHASE RIGHTS:      Mesaba shall have the right to assign to NAI
its right to purchase New Aircraft and Option
New Aircraft under the Acquisition Agreement
(as limited by the provisions of Letter
Agreement No. 3, Paragraph 1).

NEW AIRCRAFT
SUBLEASE FINANCING:   As more fully described in Section 5(a)(vi) of
the Financing Agreement, on ninety (90) days
notice as provided in Section 5(c), Mesaba may
assign to NAI its right to take delivery of
any Group of Aircraft under Sublease
financing, if NWA fully guarantees NAI's
obligations and NAI assumes all of Mesaba's
obligations, and Basic Rent shall be reduced
to $58,000 per month, in advance (subject to
escalation for Option New Aircraft).

REVERSE ASSIGNMENT
RIGHT:               NAI shall have the one-time right under each
Sublease of a New Aircraft or Option New
Aircraft to assign such Sublease to Mesaba, if
Mesaba assumes all of NAI's obligations.  Upon
each such assignment, NWA's guarantee
obligations will terminate and the Basic Rent
shall increase to $59,970 per month, in
advance (subject to adjustment for Option New
Aircraft as set forth above).

NEW AIRCRAFT
DEBT FINANCING:      As more fully described in Section 5(b)(iv),
on ninety (90) days notice (as provided in
Section 5(c)), Mesaba may assign to NAI its
right to take delivery of any Group subject to
a debt financing described in Section 5(b), if
NWA fully guarantees NAI's obligations and NAI
assumes all of Mesaba's obligations.

340A SUBLEASE
FINANCING:         As more fully described in Section 5(a)(vii),
Mesaba may assign all of its 340A Aircraft
Subleases and the right to acquire as yet
undelivered 340A Aircraft to NWA in the event
the Airline Services Agreement between Mesaba
and NWA is not renewed before March 31, 1997,
if NWA assumes all of Mesaba's obligations.

8

## TERMS APPLICABLE TO ALL FINANCINGS

SAAB AB GUARANTEE: Saab AB will guarantee SAAI's performance of its obligations to Mesaba or its assignee under the Acquisition Agreement.  Saab AB will also guarantee FLI's performance of its obligations under any Lease Financing or Debt Financing.

SUBORDINATION: As more fully described in Section 5(a)(iv) of the Financing Agreement, any sublease from FLI to Mesaba, NA or NWA shall be subject and subordinate to any applicable Head Lease.

MODIFICATIONS: As more fully described in Section 5(a)(v), Mesaba will cooperate with FLI in structuring a lease-in-lease-out transaction for New Aircraft or Option New Aircraft and in modifying the form of Sublease (Exhibit D to the Financing Agreement) for 340A Aircraft and Option 340A Aircraft so the Sublease will not conflict with the Head Lease in effect with respect to such Aircraft.

ADMINISTRATIVE
QUIET ENJOYMENT: As provided in Section 4(b) of the form of Sublease (Financing Agreement Exhibit D).

HEAD LEASE
PASSTHROUGH: As described in Section 24 of the form of Sublease (Exhibit D to the Financing Agreement), FLI will pass through to Mesaba such EBO (with at least one EBO at year twelve (12)) and renewal rights as it negotiates with the Head Lessor.  FLI also agrees to pass through to Mesaba the return conditions it negotiates with the Head Lessor (with a maximum requirement of one-quarter time/cycle limitation); FLI will endeavor to obtain provisions in the Head Lease to the effect that major components that are covered by "power-by-the-hour" agreements automatically satisfy return conditions for such components if such agreements are current and in good standing, subject to the agreement of each affected vendor.

SPARE PARTS LIEN: As more fully provided in Section 5(f), Mesaba shall grant FLI a first priority security interest in all spare parts for Saab aircraft provided hereunder or acquired through application of Spare Parts Credits, to secure Mesaba's obligations under all financings, through 2005.



9

## CONDITIONS PRECEDENT AND EFFECT OF THIS TERM SHEET

DOCUMENTATION:

1. The Acquisition Agreement
2. Letter Agreements Nos. 1 through 4
3. The Financing Agreement
4. Letter Agreement Dated March 7, 1996
   between Saab Aircraft AB and Mesaba

CONDITIONS
PRECEDENT:

None of the above-listed agreements shall be effective unless and until (1) all such agreements have been signed by each party thereto and delivered to all respective counterparties, (2) SAAI shall have received the Advance Payments ($3,000,000) for the New Aircraft and the Option Fee ($200,000) for the Option New Aircraft, (3) FLI shall have received the Advance Payments ($500,000) for the 340A Aircraft and the Option Fee ($240,000) for the Option 340A Aircraft and (4) NWA shall have approved the transactions contemplated by such final documentation. In the event that one or more of these conditions precedent shall not have been either satisfied or waived by the party to receive such signed document or payment, then all payments shall be immediately refundable to Mesaba.

EFFECT OF THIS
TERM SHEET:

By signing this Term Sheet, SAAI, FLI and Mesaba evidence their agreement to negotiate, execute and deliver definitive documentation in substantially the form and substance of the 2/18/96 drafts of the above-listed documents no later than April 15, 1996; provided, however, that in the event of any conflict between the terms set forth in this Term Sheet and any such draft, the terms set forth in this Term Sheet shall prevail.

VALIDITY AND LAW:

This Term Sheet is to be governed in all respects by the laws of the State of New York, including all matters of construction, validity and performance. It shall not be effective unless and until (1) it has been signed by and delivered to each other party, (2) SAAI shall have received half of the Advance Payments for the New Aircraft ($1,500,000) and half of the Option Fee for the New Aircraft ($100,000), (3) FLI shall have received the Advance Payments ($500,000) for the 340A Aircraft and half of the Option Fee for the Option 340A Aircraft, all on or before March 7, 1996. It shall be null and void if on or before March 7, 1996, (1) either FLI or SAAI notifies Mesaba in writing that the Board of Directors of Saab Aircraft AB has

failed to approve the transactions
contemplated hereby or (2) Mesaba notifies
both SAAI and FLI that its Board of Directors
has failed to approve the transactions
contemplated hereby.

PUBLICITY:                All of the information and content of this
                          Term Sheet (specifically including, without
                          limitation, Basic Rent provisions) shall
                          remain confidential until all three parties
                          agree otherwise.  SAAI and FLI acknowledge the
                          importance of confidentiality in light of the
                          status of Mesaba's parent company, Mesaba
                          Holdings, Inc., as a publicly-traded company.
                          Mesaba recognizes the difficulty of such
                          information remaining secret, and agrees to
                          authorize a press release as soon as possible
                          after its Board approval of the transaction is
                          obtained.  Mesaba agrees to permit SAAI and
                          FLI to review and comment in advance any
                          proposed public disclosures involving
                          information about the transactions
                          contemplated by this Term Sheet and the
                          Documents listed above.

Signed on March 7, 1996.

Mesaba Aviation,         Fairbrook Leasing,      Saab Aircraft of
Inc.                     Inc.                     America, Inc.


By                       By                       By
Bryan K. Bedford         Henrik Schröder          Mark D. Pugliese
President and CEO        President and CEO        Executive Vice President
                                                  and General Counsel


                         By                       By
                         Gena H. Laurent          Steven M. Wallace
                         Assistant Vice           Vice President -
                          President                Product Support

11

ANNEX 1

### DETERMINATION OF DELIVERY SCHEDULE
### FOR NEW AIRCRAFT AND 340A AIRCRAFT

The thirty (30) New Aircraft and twenty (20) 340A Aircraft shall be delivered commencing May 1996 and continuing through May 1998.  Subject to the following constraints, SAAI shall determine the mix of New Aircraft and 340A Aircraft for each calendar quarter at least three (3) months in advance of each quarter:

1.  Two Aircraft will be delivered each month.

2.  No more than five (5) New Aircraft will be delivered in 1996.

3.  No New Aircraft will be delivered before September 1996.

4.  No New Aircraft will be delivered in any July.

5.  By the end of 1997, at least seventeen (17) New Aircraft will be delivered.

6.  SAAI and Mesaba will cooperate with each other, particularly during the early part of the delivery cycle, in establishing delivery dates and accommodating each other's reasonable requests for flexibility.

## Saab 340A Configuration

Interior Panel Refurbishment
New Carpeting
Leather Seat Covers
New Exterior Paint
Interchangeability of Propellers
WEU to Mod. 5
EFIS Fan SB
ACT Inlet Connectors
Lucas Brushes for Generators
C-Check and Structural Inspections
Cold Weather Kit
Supplementary Heating
TCAS II
34 Passenger Seats
Forward Galley
Aft Lavatory

Fairbrook Leasing, Inc., et al. v. Mesaba Aviation, Inc.
Summons and Complaint

Exhibit B

EXHIBIT B

ALL 23 USED SAAB 340A AIRCRAFT DELIVERED TO MESABA

| (1)<br>AIRCRAFT<br>MSN<br>(340A-xxx) | (2)<br>DATE<br>DELIVERED<br>TO<br>MESABA | (3)<br>HEADLEASE<br>EXPIRATION<br>DATE | (4)<br>DATE 96<br>MONTHS<br>AFTER<br>DELIVERY | (5)<br>"BASIC"<br>LEASE<br>EXPIRATION<br>DATE<br>(*i.e.*, earlier of<br>(3) and (4)) | (6)<br>"EXTENDED"<br>LEASE<br>EXPIRATION<br>DATE |
|---|---|---|---|---|---|
| 027[a] | 11/17/1997 | - | 11/17/2005 | 11/17/2005 | - |
| 031 | 04/06/1998 | - | 04/06/2006 | 04/06/2006 | 04/06/2010 |
| 041 | 02/12/1998 | - | 02/12/2006 | 02/12/2006 | 02/12/2010 |
| 046 | 08/19/1997 | - | 08/19/2005 | 08/19/2005 | 08/19/2009 |
| 048[b] | 10/13/1997 | - | 10/13/2005 | 10/13/2005 | 10/13/2009 |
| 068[b] | 12/17/1997 | 12/10/2003 | 12/17/2005 | 12/10/2003 | - |
| 076[b] | 09/12/1997 | 09/04/2003 | 09/12/2005 | 09/04/2003 | - |
| 079[b] | 03/02/1998 | 01/11/2004 | 03/02/2006 | 01/11/2004 | - |
| 089 | 09/27/1996 | 01/11/2006 | 09/27/2004 | 09/27/2004 | 01/11/2006 |
| 091 | 12/04/1996 | 01/11/2006 | 12/04/2004 | 12/04/2004 | 01/11/2006 |
| 098 | 07/03/1996 | - | 07/03/2004 | 07/03/2004 | 07/03/2008 |
| 099[a] | 05/16/1996 | - | 05/16/2004 | 05/16/2004 | 05/16/2008 |
| 102[b] | 06/20/1996 | 12/31/2001 | 06/20/2004 | 12/31/2001 | - |
| 103[b] | 07/19/1996 | 12/31/2001 | 07/19/2004 | 12/31/2001 | - |
| 107[b] | 08/16/1996 | 12/31/2001 | 08/16/2004 | 12/31/2001 | - |
| 106[a] | 06/08/1998 | 10/15/2004 | 06/08/2006 | 10/15/2004 | - |
| 109 | 09/28/1996 | - | 09/28/2004 | 09/28/2004 | 09/28/2008 |
| 110[a] | 05/24/1996 | - | 05/24/2004 | 05/24/2004 | 05/24/2008 |
| 112 | 08/23/1996 | 07/11/2006 | 08/23/2004 | 08/23/2004 | 07/11/2006 |
| 114 | 10/25/1996 | 07/11/2006 | 10/25/2004 | 10/25/2004 | 07/11/2006 |
| 115 | 02/06/1997 | 07/11/2006 | 02/06/2005 | 02/06/2005 | 07/11/2006 |
| 119 | 07/27/1996 | 07/11/2006 | 07/27/2004 | 07/27/2004 | 07/11/2006 |
| 142 | 06/24/1998 | 10/15/2004 | 06/24/2006 | 10/15/2004 | - |

[a] Aircraft still in service (no rent in arrears) as of July 31, 2004.

[b] Aircraft previously returned to their owners, with no remaining rent obligations or other claims in this lawsuit.

Exhibit C

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
02-CV-3816(JMR/FLN)

Fairbrook Leasing, Inc., et al.      )
                                     )
              v.                     )      ORDER
                                     )
Mesaba Aviation, Inc.                )

    This matter is before the Court on cross-motions for summary judgment.  For the reasons set forth below, plaintiffs' motion is granted and denied in part; defendant's motion is denied.

I.  Background

    Plaintiffs Fairbrook Leasing, Inc. ("FLI"), Lambert Leasing, Inc. ("LLI"), and Swedish Aircraft Holdings AB ("Swedish Holdings") lease aircraft.  Defendant, Mesaba Aviation, Inc. ("Mesaba"), operates a regional airline under an airline services agreement ("code-sharing agreement") with Northwest Airlines ("Northwest").  In the course of that business, Mesaba leased Saab aircraft through FLI, LLI, and Swedish Holdings.

    Between 1996 and 1998, plaintiffs delivered 23 Saab 340A airplanes to Mesaba, which operated the planes and made monthly lease payments through 2002.  The parties dispute the duration and terms of the agreement under which Mesaba operated the aircraft.

    According to plaintiffs, a "Term Sheet Proposal for the Acquisition of Saab 340 Aircraft by Mesaba Aviation, Inc.," ("Term Sheet") constitutes an enforceable lease for terms ranging from 72 to 96 months, with a provision for an extension of up to four years at FLI's option.  Mesaba denies the Term Sheet is binding, and

**EXHIBIT C**

FILED_____  DEC 0 .
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTERED_____
DEPUTY CLERK'S INTIALS_____

claims it is only obligated to the terms of certain individual
short-term leases.

    A.   The Term Sheet

    Mesaba needed aircraft to fulfill its pending code-sharing
agreement with Northwest.  To obtain the planes, Mesaba issued a
Request for Proposal ("RFP") in August, 1995.  The RFP sought to
evaluate aircraft for Mesaba's fleet in the next decade.
Plaintiffs responded to the RFP with a series of proposals offering
to provide both new Saab 340B+ and used Saab 340A aircraft.

    On March 7, 1996, Mesaba, FLI, and Saab Aircraft of America,
Inc. ("SAAI"), executed the Term Sheet, which described the sale of
new 340B+ aircraft from SAAI, and the lease of used 340A aircraft
from FLI.  The aircraft are included in a summary section on the
document's first page.  The leasing transaction is summarized as
follows:

> FLI proposes to sublease twenty (20) 340A Aircraft to
> Mesaba, subject to existing subleases.  Mesaba will also
> acquire options for twelve (12) Option 340A Aircraft.

(Term Sheet at 1).

    The 20 used Saab 340A planes are described as "firm," rather
than "option," aircraft.  Id.  The Term Sheet's section concerning
the 340A aircraft contains subsections entitled "Documentation,"
"Commitments of FLI and Mesaba," "Specifications," "Delivery
Schedule," "Delivery Location," "Term of Subleases," "Basic Rent,"
and "Option 340A aircraft."

    Under "Documentation," the Term Sheet specifies that "[t]he

2

primary agreement is the Financing Agreement," and that the remaining sections pertaining to the leased aircraft are a "summary of selected elements of the Financing Agreement that apply to 340A Aircraft and Option 340A Aircraft."   The Term Sheet clearly contemplates individual long-term subleases for each aircraft. (Term Sheet at 6.)   Notwithstanding this provision, the parties never signed the Financing Agreement, and ultimately, executed only one long-term lease for a single aircraft.

Under "Commitments of FLI and Mesaba," the Term Sheet provides:

> As more fully described in Sections 3(a) and 4 [of the Financing Agreement], FLI shall deliver to Mesaba, and Mesaba shall sublease from FLI, twenty (20) 340A Aircraft, and Mesaba will pay, upon the signing of this Term Sheet, $25,000 per 340A Aircraft, for a total of $500,000 in Advance Payments.

(Term Sheet at 6.)

The section entitled "Term of Subleases" provides:

> At FLI's option, and depending on the remaining term of the applicable Head Lease, the term of each Sublease will be between 72 and 96 months (Section 5(a)(ii)), with best efforts to obtain four (4), one (1) year extensions at the same Basic Rent.

(Term Sheet at 7.)   The Term Sheet sets the Basic Rent as $44,000 per aircraft, per month.

The Term Sheet outlines a delivery schedule which is "[t]o be determined, based on the provisions of Annex 1."   This section, in turn, provides an overall window for delivery and a specified

3

number of aircraft deliveries each month, with the mix of new and used aircraft to be determined by SAAI.  The airplanes are to be delivered "at the facility where each Aircraft has been refurbished or another, mutually agreed location so as to minimize the tax impact of such delivery."  The Term Sheet allows Mesaba to assign certain rights to Northwest, including the "right to acquire as yet undelivered 340A Aircraft" in the event the code-sharing agreement was not renewed before March 31, 1997.  (Term Sheet at 7-8.)

The Term Sheet includes a section entitled "Conditions Precedent and Effect of This Term Sheet," which lists conditions precedent to the anticipated formal documentation, including the Financing Agreement, and defines the validity of the Term Sheet itself.  A subsection entitled "Effect of this Term Sheet" provides:

> By signing this Term Sheet, SAAI, FLI and Mesaba evidence their agreement to negotiate, execute and deliver definitive documentation in substantially the form and substance of the 2/18/96 drafts of the above-listed documents no later than April 15, 1996; provided, however, that in the event of any conflict between the terms set forth in this Term Sheet and any such draft, the terms set forth in this Term Sheet shall prevail.

(Term Sheet at 10.)

The Term Sheet states that it "is to be governed in all respects" by New York law, "including all matters of construction, validity and performance."  Id.

Finally, the Term Sheet provides that it "shall not be

4

effective unless and until . . . it has been signed and delivered
to each other party," and SAAI and FLI have received specified
partial payment.  The Term Sheet requires approval by the Board of
Directors of SAAI, FLI, and Mesaba.  (Term Sheet at 10-11.)  The
parties agree all conditions precedent to effectuating the Term
Sheet have been fulfilled.

    B.  <u>Subsequent Negotiations</u>

The parties agreed to modify the Term Sheet as a result of
Northwest's influence.  As part of the modification, FLI agreed to
a $13,000 monthly rent rebate from the Term Sheet's $44,000 rent.
(Eyres Aff., Ex. C.)  Although the Term Sheet contemplated each
aircraft being leased through FLI, Mesaba bypassed FLI and leased
several planes from companies not party to the Term Sheet --
plaintiffs LLI and Swedish Holdings.  Instead of using Saab's
standard form sublease, the parties negotiated based on Northwest's
standard form.  (Term Sheet at 6; Deposition of Henrik Schroder,
January 8, 2003, at 127-28.)

    C.  <u>Aircraft Delivery</u>

In May, 1996, while negotiations on final documents continued,
FLI began to deliver the 340A aircraft.[1]  In another departure from

---

    [1]In fact, the first 4 aircraft delivered in May, 1996, were
from LLI.   A contemporaneous letter from Saab AB to Mesaba
expressly references both the interim lease between LLI and Mesaba,
and the Financing Agreement to be executed by Mesaba, SAAI, and
FLI.  (Eyres Aff., Ex. C.)

5

the Term Sheet, the parties executed short-term subleases ranging from 2 to 3 months for each aircraft, instead of the long-term sublease of 72 to 96 months. Some of these short-term subleases contained a form of integration clause. All but one acknowledged their status as "interim" leases, and stated an agreement on a longer-term lease was "pending." None of the subleases referenced the Term Sheet. The parties continued to negotiate, but were ultimately able to conclude only one long-term aircraft lease calling for a term of 96 months. (Eyres Aff., Ex. Q1, at 003007.)

Mesaba made a 10-Q filing before the Securities and Exchange Commission for the quarter ending June 30, 1996. The filing reported delivery of 4 used Saab 340A aircraft, and stated Mesaba "had agreed to acquire 30 new Saab 340B Plus and 20 used Saab 340A aircraft." (Second Poley Aff., Ex. H.)

The Term Sheet called for an April 15, 1996, deadline, at which time the parties were to deliver definitive documentation. This deadline was extended in writing several times, but finally expired on August 30, 1996. Notwithstanding the absence of a finalized agreement, plaintiffs continued to deliver -- and Mesaba continued to accept -- planes under short-term leases.[2]  These

---

[2]LLI is a party to four leases, each dated May 15, 1996 (Eyres Aff., Ex. Q11-12, 17-18.) First Security Bank, N.A., as trustee for Saab Aircraft Credit AB, is a party to five leases dated October, 1997, through March, 1998 (Eyres Aff., Ex. Q1-5); these constitute direct leases from Swedish Holdings. FLI is a party to the remaining fourteen leases, dated June, 1996, through June, 1998. (Eyres Aff., Ex. Q6-10, 13-16, 19-23.)

6

leases were extended by agreement several times.

The parties continued to negotiate the terms of long-term leases throughout 1996 and 1997.   Mesaba's amended 1996 10-K identified the Term Sheet among its "material contracts" as Exhibit 10-U.   The Term Sheet has been noted, by reference, in each of Mesaba's subsequent 10-K reports.   (Second Poley Aff., Ex. J-L.)

On July 1, 1997, Mesaba and Northwest executed a new ten-year code-sharing agreement that referenced the Term Sheet and stated:

> [W]ith respect to Saab 340A Aircraft, the term of each sublease shall be for a period ending on the earlier of the Termination Date [of the Code-sharing Agreement, i.e., July 1, 2007] or the date which corresponds with the 17th year of life of an Aircraft subject to this Sublease; provided, however, no Sublease shall be for a term longer than the term of the applicable head lease.

(Second Poley Aff., Ex. M.)   The code-sharing agreement further provided that the monthly rent for each 340A aircraft should not exceed $31,000.   Id.

D.   Saab's Announcement

In December, 1997, Saab announced it would cease manufacturing the 340 model commercial aircraft, prompting Mesaba's concern that the cost of repair and maintenance might increase.   This led to further negotiations with FLI.   Mesaba's then-president and former general counsel testified that they used the long-term lease negotiations as leverage in an attempt to obtain what Mesaba characterized as a "maintenance cost guarantee" and plaintiffs called a "customer support agreement." (Deposition of Bryan K.

7

Bedford, February 20, 2003, at 47-50; Deposition of John S.

Fredericksen, January 16, 2003, at 63-64, 66.)

Even after Saab's announcement, plaintiffs continued to

deliver, and Mesaba accepted delivery of, Saab 340A aircraft.

Mesaba's 10-K report for the year ending March 31, 1998, states:

> In March, 1996, Mesaba entered into an agreement with
> Saab Aircraft of America, Inc. ("Saab") for the
> acquisition of 30 new Saab 340B Plus aircraft and 20 used
> 340A aircraft. As of March 31, 1998, all of the aircraft
> covered by this agreement had been delivered. The
> Company also exercised its option agreement for 19
> additional new Saab 340B Plus aircraft and three
> additional used Saab 340A aircraft.

(Second Poley Aff., Ex. I.)

Despite requests from FLI, Mesaba refused to sign long-term

leases for the 340A aircraft. Negotiations ultimately ceased in

December, 1998. (Fredericksen Dep. 63-64.) Mesaba has continued

to operate the 23 Saab 340A aircraft throughout 1998, 1999, 2000,

and 2001, and continued its lease payments of $31,000 per aircraft

per month. In March, 2001, Mesaba waived FLI's obligation to seek

four one-year extensions for the first three aircraft whose head

leases were set to expire in December 2001. (Eyres Aff. Ex. P,

Second Poley Aff. Ex. P.)

E.   The Current Dispute

In 2001, Mesaba declared it would begin to return some of the

leased aircraft. FLI protested that the aircrafts' lease duration,

as established under the Term Sheet, had not expired. On July 9,

8

2002, Mesaba argued it was bound by only the individual short-term leases, and once those expired, it could return the aircraft at any time.   In October, 2002, Mesaba ceased making lease payments for several of the Saab 340A aircraft.   This action ensued.

II.   <u>Analysis</u>

    A.   <u>Summary Judgment</u>

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact.   Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 246 (1986).   The party opposing summary judgment may not rest upon the allegations set forth in its pleadings, but must produce significant probative evidence demonstrating a genuine issue for trial.   <u>See</u> <u>Anderson</u>, 477 U.S. at 248-49; <u>see also</u> <u>Hartnagel v. Norman</u>, 953 F.2d 394, 395-96 (8th Cir. 1992).   "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." (Emphasis omitted.)   <u>Anderson</u>, 477 U.S. at 247-48.   If the opposing party fails to carry that burden, or fails to establish the existence of an essential element of its case on which that party will bear the burden of proof at trial, summary judgment should be granted.   <u>See</u> <u>Celotex</u>, 477 U.S. at 322.

When the matter before the Court is a question of contract, if
the intent of the parties can be determined from written documents,
the question of whether a binding contract exists is a matter of
law appropriately determined on summary judgment. See Shann v.
Dunk, 84 F.3d 73, 77 (2d Cir. 1996); Arcadian Phosphates, Inc. v.
Arcadian Corp., 884 F.2d 69, 73 (2d Cir. 1989); see also Four
Seasons Hotels Ltd. v. Vinnik, 515 N.Y.S.2d 1, 6 (N.Y. App. Div.
1st. Dept. 1987).

B.   Is the Term Sheet Binding?

Under New York law, a preliminary agreement will not
ordinarily bind parties who contemplate further negotiation and the
execution of a formal instrument. Adjustrite Systems, Inc. v. GAB
Bus. Servs., Inc., 145 F.3d 543, 548 (2d Cir. 1998).
Notwithstanding this general principle, preliminary agreements may
be found binding in appropriate circumstances. Id.

New York law recognizes two types of binding preliminary
agreements. The first, ("Type I"), arises when the parties agree
on "all the points that require negotiation" and is preliminary
only as to form. The parties have the right to demand performance
of the transaction. Id. The second, ("Type II"), establishes a
framework for agreement, and binds the parties to negotiate in good
faith within that framework. The parties are free to walk away
once they have "made a good faith effort to close the deal and have
not insisted on conditions that do not conform to the preliminary

10

writing." __See__ __id.__, citing __Teachers Ins. and Annuity Assn. v.__
__Tribune Co.__, 670 F. Supp. 491, 498 (S.D.N.Y. 1987) (__Tribune__).
Here, the parties have addressed both Type I and Type II theories,
and the Court considers both theories.

In each type of agreement, as in most contract cases, the
parties' intent determines whether they are bound and to what
extent.  __Adjustrite__, 145 F.3d at 548-49.  "To discern that intent
a court must look to the 'words and deeds [of the parties] which
constitute objective signs in a given set of circumstances.'"  __Id.__,
citing __Winston v. Mediafare Ent. Corp.__, 777 F.2d 78, 80 (2d Cir.
1986) (alteration in original).  Subjective evidence of intent is
usually not considered.  __Adjustrite__, 145 F.3d at 549, citing __Rule__
__v. Brine, Inc.__, 85 F.3d 1002, 1010 (2d Cir. 1996).

To assess whether the parties have demonstrated an intent to
be bound by a Type I agreement, a court considers (1) the language
of the agreement; (2) the existence of open terms; (3) whether
there has been partial performance; and (4) whether the agreement
is of the type usually committed to writing.  __Arcadian__, 884 F.2d at
72.  For a Type II agreement, a court considers the same four
factors, plus a fifth -- the context of the negotiations resulting
in the preliminary agreement.  __Adjustrite__, 145 F.3d at 549, n.6.
Here, the Court examines each factor in turn.

11

C.   Is there a Type I agreement?

    1.   The language of the agreement

The agreement's language is "the most important" factor. Adjustrite, 145 F.3d at 549, citing Arcadian, 884 F.2d at 72. "'There is a strong presumption against finding binding obligation in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents.'" Arcadian, 884 F.2d at 73, quoting Tribune, 670 F. Supp. at 499.

Language expressing an intent to be bound at a later point supports the presumption. See Adjustrite, 145 F.3d at 550 (no binding agreement where language expressly contingent "'upon the execution of a sales agreement contract'"); Arcadian, 884 F.2d at 72-73 (no binding agreement where language referred to a future binding agreement and expressly contemplated that negotiations might fail); Kreiss v. McCown De Leeuw & Co., 37 F. Supp. 2d 294, 300 (S.D.N.Y. 1999) (no binding agreement where language states "[i]t is understood that this letter shall not be deemed to be self-executing, and that the parties' respective legal obligations . . . shall arise solely from definitive documents to be entered into"); In re Mizlou Commun. Co., 1993 WL 36158, *6 (S.D.N.Y. 1993) (no binding agreement where language states "the terms hereof shall have no force and effect until definitive documentation containing such terms is executed").

12

Language which acknowledges that the parties have not yet reached an agreement also supports the presumption that the parties do not intend to be bound. See Gorodensky v. Mitsubishi Pulp Sales (MC), Inc., 92 F. Supp. 2d 249, 255 (S.D.N.Y) ("[w]e are looking forward to entering detailed commercial discussions as soon as practicable"), aff'd, 242 F.3d 365 (2d Cir. 2000). Additional support for the presumption may come from agreement language that is incomplete or missing key terms. See R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 71-72 (2d Cir. 1984) (no binding agreement where blank spaces in standard form franchise agreement had not been filled in with key provisions concerning development schedule and franchise territory).

Applying these principles here, the Court finds the Term Sheet's language indicates the parties have reached a Type I agreement. The Term Sheet's length, detail, formality, and completeness lends support to the finding that this document defines the parties' obligations, and is not a mere invitation for them to continue to negotiate. The Term Sheet unambiguously states that, "By signing this Term Sheet, SAAI, FLI and Mesaba evidence their agreement to negotiate, execute and deliver definitive documentation . . . ." This language does not indicate a qualification or hesitation concerning the existence of an agreement; it merely indicates that scrivener work -- "definitive documentation" -- remains to be done. The Term Sheet's language

13

explicitly resolves future issues which may arise as the conforming documents are drafted.  It does so by specifying that in the event of a conflict between the Term Sheet's terms and any subsequent drafts, the Term Sheet's terms "shall prevail."

It is also appropriate to note that the CEOs of Mesaba and FLI each initialed the first ten pages of the Term Sheet, and all executed it on the last page.  In doing so, they agreed the Term Sheet would be governed by New York law in matters of "construction, validity <u>and performance</u>" (emphasis added); and that its effectiveness depended upon five listed conditions precedent, all of which were fulfilled.

The Court recognizes that the Term Sheet also calls for additional conditions precedent to the formal documentation, including the Financing Agreement.  But the parties carefully avoided making the Term Sheet effective on the execution of formal documentation.  <u>Contrast, e.g., Adjustrite</u>, 145 F.3d at 549-50. Indeed, the Term Sheet provides that Mesaba's obligation to pay FLI $500,000 arose "upon the execution of this Term Sheet," and that FLI's obligation to deliver planes began in May, 1996.  (Term Sheet at 2, and Annex 1.)  As a result, neither party's performance was contingent on further or formal documentation.  The Court does not consider it trivial that even though a final document was never created, the parties actively engaged in millions of dollars of aircraft delivery and lease payments for those planes.

14

Finally, although the Term Sheet sets a deadline for drafting
formal documents and acknowledges the possibility that Mesaba's
code-sharing agreement with Northwest might not be completed, the
Term Sheet never suggests the parties have not closed their deal.
Contrast Arcadian, 884 F.2d at 70 (providing for repayment of
capital expenditures and refund of buyer's deposit if negotiations
failed); Ogden Martin Systems of Tulsa, Inc. v. Tri-Contl. Leasing
Corp., 734 F. Supp. 1057, 1068 (S.D.N.Y. 1990) (providing for
reimbursement of expenses should the transaction fail to close).

The Term Sheet language demonstrates the parties' completion
of a Type I agreement.

### 2.   The existence of open terms

The presence of open terms, especially when there remain
ongoing negotiations, suggests the parties do not intend to be
bound. See Winston, 777 F.2d at 82-83; Spencer Trask Software and
Info. Servs. LLC v. RPost Intl. Ltd., 2003 WL 169801, *9 (S.D.N.Y.
2003). This suggestion can be overcome when the open terms are
insignificant to the parties, see Shann, 84 F.2d at 77-78 (2d Cir.
1996), or when all essential terms have been agreed upon, see
Tribune, 670 F. Supp. at 501.

Here, Mesaba suggests the Term Sheet is missing customary
aircraft lease terms, for example, insurance and maintenance
obligation, aircraft identifiers, delivery dates, and delivery
places. FLI replies that the Term Sheet does not purport to be an

15

aircraft lease, and that many of the "open" terms are either
determinable or have already been determined by the parties, for
example, all specified aircraft have been delivered and accepted.

The Court considers Mesaba's objections on this ground to be
cavils.  The Term Sheet sets out a commitment to obtain described
aircraft.  Certainly each plane has a serial number, but the Term
Sheet's failure to recite those numbers does not change Mesaba's
commitment to obtain the planes.  Other than the inconsequential
absence of a stated delivery location, there is no indication that
either party has ever had the slightest complaint about the date,
timing, or place of delivery.  The monthly lease rate was not only
established, but was satisfactorily modified by the parties'
subsequent agreement.  The parties have treated this as a completed
contract - because it was.

### 3.  Partial performance

Partial performance is "an unmistakable signal that one party
believes there is a contract; and the party who accepts performance
signals, by that act, that it also understands a contract to be in
effect."  R.G. Group, 751 F.2d at 75-76.  The parties' performance
and expressions of intent can establish a binding agreement even in
the absence of a written contract.  See V'Soske v. Barwick, 404
F.2d 495, 499-500 (2d Cir. 1968).  However, it is clear that even
substantial partial performance creates no binding agreement where
the parties otherwise do not intend to be bound.  Adjustrite, 145

16

F.3d at 550 (plaintiffs performed under preliminary agreement for six months; no enforceable agreement); Missiaman v. USI Northeast, Inc., 131 F. Supp. 2d 495, 510 (S.D.N.Y. 2001) (plaintiff substantially performed obligations of preliminary agreement and worked for defendant for two years; no enforceable agreement).

It is black letter law that partial performance requires "some actual performance of the contract, such that the plaintiffs must have conferred something of value upon the defendants which the defendants accepted." Spencer Trask Software, 2003 WL 169801 at *9 (citation omitted). Partial performance is "most persuasive when . . . of a type that the performing party would be unlikely to render without the assurance of a binding contract[,]" for example when the performance cannot be easily undone. Henchman's Leasing Corp. v. Condren, 1989 WL 11440, *4 (S.D.N.Y. 1989).

The Court finds this factor strongly supports the conclusion that the Term Sheet is a binding contract. Plaintiffs delivered, and defendant paid for, 23 aircraft, even in the absence of final documents. This occurred using only the Term Sheet. The parties' performance continued, even recognizing that other collateral matters might remain. These aircraft were unquestionably of benefit to Mesaba, constituting as they did an essential part of its fleet.

### 4. Are written agreements customary?

Certainly, this case and the parties' disagreement would be

17

easier to resolve if each of the contemplated documents had been
drafted and exchanged.  Of course, had that occurred, this case
might never have arisen.   This observation does not, however,
undermine the agreement.

This case arises not in the context of a law school
examination, but in the real world.  Plaintiffs had airplanes for
sale and lease, and Mesaba needed those planes to transport its
customers.   When the costs of obtaining and maintaining those
planes were too high, the parties renegotiated the lease rate.
When the parties found it more convenient for Mesaba to lease
planes from LLI and Swedish Holdings, they agreed to do so.  It is
clear to the Court that the parties found having planes in Mesaba's
hands, and plaintiffs receiving a cash flow, to be more important
than having a bunch of written documents.

In a perfect world, the final documents would have been
exchanged and signed, but neither the parties nor this Court occupy
that world.   This does not mean the parties did not have a
contract; they did -- the Term Sheet.

D.   Is There a Type II Agreement?

Even assuming there is no Type I agreement, the Term Sheet
satisfies the requirements of a Type II agreement.   The factors
above, plus the overall context of negotiations, favor a conclusion
that Mesaba and FLI bound themselves at a minimum to a framework
within which to negotiate open terms in good faith.

18

The Term Sheet is explicit:  "By signing this Term Sheet,
SAAI, FLI and Mesaba evidence their agreement to negotiate, execute
and deliver definitive documentation in substantially the form" of
earlier drafts.   (Term Sheet at 10.)   Because the Term Sheet
language controls subsequent drafts, the framework is clear -- the
parties were to negotiate long-term leases for at least the 20
"firm" used Saab 340A airplanes. A Type II agreement arises "when
the parties agree on certain major terms, but leave other terms
open for negotiation." See Adjustrite, 145 F.3d at 548; Tribune,
670 F. Supp. at 501 (finding Type II agreement where two page term
sheet "covered the important economic terms of a loan").   As
described above, the Term Sheet reflects agreement on all "major
terms" of a lease:  the identity of lessor and lessee, the number
of planes, the rent for each, the configuration of each plane, the
delivery schedule, and the lease term.   Here, FLI and Mesaba
performed the major terms as they continued to negotiate the minor
ones.

The overall context of the negotiations supports a conclusion
that a Type II agreement existed.  Mesaba needed planes to fulfill
its route obligations under a ten-year Northwest code-sharing
agreement which was up for renewal in the summer of 1997.  All of
Mesaba's business derives from this code-sharing agreement, and
presumably, it would have been of some concern to Northwest if
Mesaba did not have enough planes to fly its routes.   Yet the

19

record does not reflect that Mesaba either had, or was pursuing,
any other long-term contracts to supply Saab 340A planes in 1997.
Compare Tribune, 670 F. Supp. at 500 (negotiation context supported
finding Type II agreement between borrower and lender where
borrower needed lender's firm commitment to satisfy its obligations
in a transaction with third party).  Like the borrower in Tribune,
Mesaba needed plaintiffs' performance to fulfill its obligations.

        Saab's December, 1997, announcement that it was ceasing to
manufacture these aircraft may have shifted the negotiations, but
did not affect the parties' obligations outside the Term Sheet
framework.  Changed circumstances may make a deal less attractive
to one side than it was at the time of the initial agreement, but
courts will hold the parties to their bargain.  Compare Tribune,
670 F. Supp. at 501 ("Teachers would not have been free to walk
away from the loan by reason of a subsequent decision that the
transaction was not in Teachers' interest.  Nor could Tribune.");
Teachers Ins. and Annuity Assn. v. Ormesa Geothermal, 791 F. Supp.
401, 405 (S.D.N.Y. 1991); Teachers Ins. and Annuity Assn. v.
Butler, 626 F. Supp. 1229, 1232 (S.D.N.Y. 1986).  Here, Mesaba saw
an opportunity to address its changed economic priorities by
insisting on changes in its agreement with FLI, and obtained a
benefit in the form of reduced monthly payments with assurances of
continued maintenance and parts (the "maintenance cost guarantee"
or "customer support agreement").   In signing the Term Sheet,

20

Mesaba agreed to execute, or at the very least to negotiate in good
faith, long-term leases for each airplane.  Mesaba's refusal to
continue negotiating long-term leases may not involve subjective
bad faith, but nonetheless, constitutes a breach of its obligations
under the Term Sheet.

Plaintiffs' action to enforce the parties' Type II agreement
is not barred by limitations.  Although Mesaba correctly notes that
a breach of contract claim accrues at the time of the breach, <u>Raine
v. RKO General, Inc.</u>, 138 F.3d 90, 93 (2d Cir. 1998), the Court
does not consider the expiration of the August 30, 1996, deadline
for "definitive documentation" to be a breach of the Term Sheet's
obligation to negotiate.  The Term Sheet provides no method for
extending or enforcing the deadline, and no consequences if the
deadline is missed.   <u>Contrast</u> <u>Ormesa</u>, 791 F. Supp. at 411
(commitment letter provides that it expires at deadline unless
extended by lender in writing); <u>G.P. Putnam's Sons v. Owens</u>, 378
N.Y.S.2d 637, 638 (N.Y. App. Div. 1st Dept. 1976) (agreement gives
publisher option to terminate contract if author does not deliver
manuscript by deadline).

The parties clearly agreed in writing to extend their deadline
three times in 1996, and when the last extension expired, they
simply continued to negotiate without pursuing another written
extension.  "When an agreement expires by its terms, if, without
more, the parties continue to perform as theretofore, an

21

implication arises that they have mutually assented to a new contract containing the same provisions as the old." <u>Martin v. Campanaro</u>, 156 F.2d 127, 129 (2d Cir. 1946). It is undisputed that on October 2, 1996, six years before this action was filed, the parties were performing their obligations under the Term Sheet, including their obligation to negotiate definitive documentation. They continued to negotiate for another two years. The Court finds plaintiffs' claims related to Type II obligations under the Term Sheet timely.

    E.  <u>Is the Term Sheet Superseded by the Short-term Leases?</u>

    "When the parties to a contract enter into a new agreement that expressly supersedes the previous agreement, the previous agreement is extinguished[.]" <u>Health-Chem Corp. v. Baker</u>, 915 F.2d 805, 811 (2d Cir. 1990). Here again, the parties' intention controls. <u>Dickinson v. Vance</u>, 53 N.Y.S. 619, 621 (N.Y. App. Div. 4th Dept. 1898). In this regard, Mesaba argues that the individual short-term leases' integration clauses reflect the parties' intent to replace the Term Sheet with the short-term individual leases. FLI replies that the short-term leases were mere "placeholders," allowing the aircraft to be delivered and operated pending agreement on the form of long-term leases.

    The Court finds FLI's interpretation to be consistent with both the language of the documents and the context of the transaction. Twelve of the 22 short-term leases have no

22

integration clause whatsoever. (Q6-10, 13-14, 16, 19-22.)   The
integration clauses in the others are general,[3] and do not
expressly provide that the lease supersedes the Term Sheet.
Contrast Kindler v. Newsweek, Inc., 717 N.Y.S.2d 56, 56 (N.Y. App.
Div. 1st Dept. 2000) (party's reliance on prior agreement
unjustified when new contract expressly states it supersedes the
old).   Moreover, virtually all[4] of the short-term leases which
contain integration clauses (and most without them) contain
language to this effect:

> This Sublease is being entered into as an interim
> sublease, pending agreement by Sublessee and Sublessor on
> a permanent, long-term sublease of the Aircraft, which
> will supersede this Sublease in all respects, *ab initio*.
> Sublessor and Sublessee will work together to implement
> such replacement sublease no later than the expiration of
> the term of this sublease.   No provisions of this
> Sublease constitute precedents for the provisions of the
> permanent Sublease.[5]

(Eyres Aff., e.g., Ex. Q19.)   The contrast is striking.   When the

---

[3]As examples, various integration clauses read: "This Lease,
including all schedules and appendices, constitutes the entire
agreement between the parties" (Q1-5); "This instrument, including
all appendixes, constitutes the entire agreement between the
parties" (Q11-12, 17-18); and "This [Lease or Sublease] constitutes
the entire agreement between the parties with respect to the
subject matter hereof."   (Q1-5, 15, 23).   Some of the leases
contain more than one such clause.

[4]The lease for aircraft 340A-091 has neither an integration
clause nor the "interim lease" language.   (Eyres Aff., Ex. Q10.)

[5]As with the integration clauses, the "interim sublease"
paragraph has slight variations which do not affect its
interpretation.

23

parties intend the long-term leases to supersede the short-term
leases, they say so explicitly; but on the question of whether the
short-term leases supersede the Term Sheet, they say nothing.  This
supports the Court's conclusion that the parties did not intend the
short-term leases to extinguish the Term Sheet.

     If a subsequent writing can be construed in harmony with the
original contract, there is no need to alter the original.
Application of Intl. Packaging Co. v. China Natl. Cereals, Oils &
Foodstuff Import & Export Co., 559 N.Y.S.2d 302, 305 (N.Y. App.
Div. 1st Dept. 1990).  Here, the Term Sheet and the subleases can
be harmonized.  The Term Sheet clearly contemplated subsequent
documentation and provided that its terms "shall prevail."  The
short-term leases provide that they are interim leases that will
eventually be superseded by permanent leases, for which their terms
shall not provide any precedent.  Read together, the Term Sheet and
short-term leases establish that the parties intended the Term
Sheet to control  until permanent long-term leases could be drafted
and executed.

     F.  Do LLI and Swedish Holdings Have Rights Under the Term
         Sheet?

     Generally, a contract may be enforced only by a party or one
in privity with a party.  See Seaver v. Ransom, 120 N.E. 639, 640
(N.Y. 1918); Sone v. Tsumura, 634 N.Y.S.2d 689, 691 (N.Y. App. Div.
1st Dept. 1995).  LLI and Swedish Holdings did not sign the Term

                                    24

Sheet and are not referenced therein. Although the draft Financing
Agreement expressly gives FLI the option to lease planes through
affiliated or unaffiliated companies, the Term Sheet says nothing
on this issue.  The parties have introduced no written assignment
of FLI's rights and obligations under the Term Sheet.

It is clear to the Court, however, that LLI and Swedish
Holdings delivered, and Mesaba accepted, 9 of the 23 planes.
Indeed, the very first planes delivered came from LLI.   The
deliveries conformed to the Term Sheet as modified by the parties.
Mesaba never objected, and never treated these deliveries as a
breach of FLI's obligation.  In its 10-Q and 10-K statements,
Mesaba counted the planes from LLI and Swedish Holdings among those
obtained under the Term Sheet.

Given these facts, the Court finds the parties both
contemplated, and in all respects acted, as if LLI and Swedish
Holdings were integral participants in the Term Sheet agreement.
The Court will give effect to the obvious intention of the parties,
for the aim of contract law is "to gratify, not to defeat,
expectations that arise out of intended contractual agreement[.]"
Tribune, 670 F. Supp. at 498.  Therefore, the Court finds as a
matter of law that LLI and Swedish Holdings have the right to
enforce the Term Sheet as it relates to the planes they supplied.

G.   Is the Term Sheet Too Indefinite to Enforce?

Regardless of the parties' intent, a court will not enforce a

25

contract unless it is "sufficiently certain and specific . . . that
what was promised can be ascertained." <u>Joseph Martin .Jr.,
Delicatessen, Inc. v. Schumacher</u>, 436 N.Y.S.2d 247, 249 (N.Y.
1981). Mesaba argues that, regardless of what the parties agreed
to, the Term Sheet is too indefinite to enforce.

The Court disagrees. The Term Sheet sets forth all essential
elements of the lease in terms which were definite enough to allow
them to perform and modify their agreement over a period of years.
The lease duration itself is sufficiently definite to enforce as
long as the Term Sheet provides a methodology by which it may be
determined. <u>Id.</u> at 250.

The Court finds that the Term Sheet expressly grants FLI the
authority to determine the lease duration within the range of 72 to
96 months, subject to the terms of any applicable head leases.
(Term Sheet at 7.)  The Court concludes this methodology is
sufficiently definite to render the Term Sheet enforceable.  The
Court, however, further concludes that the Term Sheet's language
regarding the four one-year lease extensions is ambiguous.

Whether a contract is ambiguous is a question of law to be
determined by looking at the entire contract and the intention of
the parties.    <u>See Kass v. Kass</u>, 673 N.Y.S.2d 350, 356-57 (N.Y.
1998). While the Term Sheet obliges FLI to make "best efforts" to
obtain extensions, it identifies no circumstance which triggers
FLI's obligation. The "best efforts" clause might mean either that

FLI could unilaterally extend the leases by up to four years, as it
argues, or that FLI would be required to seek extensions only if
Mesaba requested or desired the extensions, as Mesaba argues.

It is well established that the parties' own construction of
an ambiguous term, as evidenced through their course of conduct,
may clarify the clause's meaning.  See City of New York v. New York
City Ry. Co., 86 N.E. 565, 567 (N.Y. 1908).   However, where
"determination of the intent of the parties depends on the
credibility of extrinsic evidence or on a choice among reasonable
inferences to be drawn from extrinsic evidence," the question
becomes one for a jury.  Hartford Acc. & Indem. Co. v. Wesolowski,
350 N.Y.S.2d 895, 898 (N.Y. 1973).

Faced with this ambiguous term, the Court can look to
extrinsic evidence.  Both sides have submitted extrinsic evidence,
but the Court cannot find that the evidence resolves the issue.[6]
Accordingly, plaintiffs' motion for summary judgment with regard to
the lease extensions is denied.

_____

[6]As examples:  (a) The Financing Agreement provides that "FLI
shall use commercially reasonable efforts to obtain extensions from
the Head Lessor so as to allow FLI to provide Mesaba with four (4)
one year renewals."  (Eyres Aff., Ex. H at 5(a)(ii).); (b) Mesaba's
former CEO and general counsel testified that Mesaba had to request
the extensions.  (Bedford Dep. at 30; Fredericksen Dep. at 121.);
(c) FLI's executives testified that it was FLI's option to provide
the extensions.  (Schroder Dep. at 95, Deposition of Gena Laurent,
February 25, 2003, at 74.); and (d) In March 2001, at FLI's
request, Mesaba waived FLI's obligation to seek lease extensions.

27

III.  <u>Conclusion</u>

For all the foregoing reasons, plaintiffs' motion for summary judgment is granted in part and denied in part.  Defendant's motion for summary judgment is denied.

IT IS SO ORDERED.

Dated:  December 8, 2003

JAMES M. ROSENBAUM
United States Chief District Judge

28