Fairbrook Leasing, Inc., et al. v. Mesaba Aviation, Inc.
Summons and Complaint

SCANNED

AUG 1 3 2004

U.S. DISTRICT COURT MPLS

Exhibit D

# AIRCRAFT SUBLEASE AGREEMENT

dated as of

June 1, 1997

between

## FAIRBROOK LEASING, INC.,

*as Sublessor*

and

## MESABA AVIATION, INC.,

*as Sublessee*

---

Covering One Saab Model 340B Aircraft
with General Electric Engines
and
Dowty Rotol Propellers
Manufacturer's Serial Number 340B-181
U.S. Registration Number N590MA

THE RIGHTS OF FAIRBROOK LEASING, INC. UNDER THIS AIRCRAFT SUBLEASE AGREEMENT AND IN THE AIRCRAFT COVERED HEREBY HAVE BEEN ASSIGNED TO, AND ARE SUBJECT TO SECURITY INTERESTS IN FAVOR OF, FIRST SECURITY BANK, NATIONAL ASSOCIATION, NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY AS OWNER TRUSTEE, AS U.S. LESSOR, UNDER U.S. LEASE AGREEMENT NO. 1 DATED AS OF APRIL 10, 1990. THE RIGHTS OF U.S. LESSOR HAVE BEEN FURTHER ASSIGNED TO, AND ARE SUBJECT TO SECURITY INTERESTS IN FAVOR OF, NATIONAL WESTMINSTER BANK PLC, AS SECURED PARTY, UNDER LOAN AND SECURITY AGREEMENT (SERIES A) NO. 1 DATED AS OF APRIL 10, 1990, AND THE RIGHTS OF U.S. LESSOR UNDER U.S. LEASE AGREEMENT NO. 1 HAVE ALSO BEEN ASSIGNED TO, AND ARE SUBJECT TO A SUBORDINATE SECURITY INTEREST IN FAVOR OF, SWEDISH AIRCRAFT TWO KB, AS LESSOR UNDER AMENDED AND RESTATED AIRCRAFT LEASE AGREEMENT NO. 1 DATED AS OF APRIL 105, 1990. THIS AIRCRAFT SUBLEASE AGREEMENT HAS BEEN EXECUTED IN COUNTERPARTS. TO THE EXTENT THIS AIRCRAFT SUBLEASE AGREEMENT CONSTITUTES CHATTEL PAPER (AS SUCH TERM IS DEFINED IN THE UNIFORM COMMERCIAL CODE AS IN EFFECT IN ANY APPLICABLE UNITED STATES JURISDICTION), NO SECURITY INTEREST IN THIS AIRCRAFT SUBLEASE AGREEMENT MAY BE CREATED THROUGH THE TRANSFER OR POSSESSION OF ANY COUNTERPART OTHER THAN THE ORIGINAL EXECUTED COUNTERPART CONTAINING THE RECEIPT THEREFOR EXECUTED BY NATIONAL WESTMINSTER BANK PLC AS SECURED PARTY ON THE SIGNATURE PAGE HEREOF.

**EXHIBIT D**

**TABLE OF CONTENTS**

Page

Parties ................................................................................................. 1

Introduction........................................................................................... 1

1.  Agreement to Sublease ................................................................1

2.  Definitions ...................................................................................1

3.  [Reserved.] .................................................................................5

4.  Term...........................................................................................5

5.  Rent...........................................................................................5

6.  Disclaimer of Warranty; Subordination.......................................7

7.  Insurance....................................................................................8

8.  Loss or Damage to Aircraft........................................................10

9.  General Tax Indemnity ...............................................................12
    9.1  Taxes Indemnified ...........................................................12
    9.2  Taxes Excluded ...............................................................13
    9.3  Payments on an After-Tax Basis, etc.................................14
    9.4  Procedures.......................................................................14
    9.5  Contest.............................................................................15

10. General Indemnity .....................................................................16

11. Ownership; Liens.......................................................................16

12. Net Lease; Fuel, Storage Charges and Other Expenses.............17

13. Identification Plates ...................................................................17

14. Location, Possession and Use of Aircraft ..................................17

15. Operation, Maintenance and Modification...................................18
    (a)  Generally......................................................................18
    (b)  Records; Information .....................................................18
    (c)  Replacement of Parts ....................................................18
    (d)  Alterations-Generally.....................................................19
    (e)  Additions-Severable; Nonseverable...............................19

i

16.    Performance of Sublessee Obligations by Sublessor................................................19

17.    Inspection................................................................................20

18.    Use and Possession; Sublessor Liens................................................20

19.    Return of Aircraft................................................................20

20.    [Reserved.]................................................................22

21.    Mortgage, Assignment and Sublease................................................22

22.    Events of Default................................................................22

23.    Remedies of Sublessor................................................................23

24.    Sublessor's Failure to Exercise Rights................................................24

25.    Further Assurance................................................................24

26.    Notices................................................................24

27.    Severability................................................................24

28.    [Reserved.]................................................................25

29.    Notice of Events Affecting Aircraft................................................25

30.    Applicable Law................................................................25

31.    Federal Bankruptcy Code................................................................25

32.    Exhibits and Supplements................................................................25

33.    Counterparts................................................................25

Schedule 1    Sublease Rent Schedule

Exhibit A     Form of Sublease Supplement

Exhibit B     Insurance Endorsements

Exhibit C     Form of Return Acceptance Certificate

## AIRCRAFT SUBLEASE AGREEMENT

THIS AIRCRAFT SUBLEASE AGREEMENT ("Sublease") is made as of June 1, 1997 between Fairbrook Leasing, Inc., a Delaware corporation ("Sublessor"), and Mesaba Aviation, Inc., a Minnesota corporation ("Sublessee").

## I N T R O D U C T I O N

WHEREAS, First Security Bank, National Association("FSB"), not in its individual capacity, but solely as Owner Trustee under Trust Agreement No. 1 dated as of April 10, 1990 between FSB and Security Pacific Leasing Corporation (the "Owner Participant") (FSB in such capacity being referred to as the "U.S. Lessor") and Sublessor are parties to U.S. Lease Agreement No. 1 dated as of April 10, 1990 (the "U.S. Lease") covering the Aircraft; and

WHEREAS, Sublessee desires to sublease from Sublessor and Sublessor is willing to sublease to Sublessee the Aircraft upon and subject to the terms and conditions of this Sublease;

NOW, THEREFORE, the parties hereto agree as follows:

1.      Agreement to Sublease.  Sublessor hereby agrees to sublease to Sublessee, and Sublessee hereby agrees to sublease from Sublessor, the Aircraft, such subleasing to be conclusively evidenced by the execution and delivery by Sublessor and Sublessee of a Sublease Supplement covering the Aircraft.  Sublessor and Sublessee hereby agree that execution and delivery of such Sublease Supplement shall, without further act, irrevocably constitute acceptance by Sublessee of the Aircraft for all purposes of this Sublease.

2.      Definitions.  The following terms shall have the meanings shown:

"Abatement" when used in relation to rent or other sums due shall mean any abatement, reduction, withholding, set off, counterclaim, recoupment, defense or other right of Sublessee against Sublessor or anyone else for any reason whatsoever.

"Aircraft" shall mean the Airframe to be delivered and subleased hereunder, together with the two Engines and Propellers initially installed on such Airframe (or any Replacement Engine or Replacement Propeller), whether or not from time to time installed on the Airframe or on any other airframe.

"Airframe" shall mean (i) the Saab Model 340B passenger aircraft (except Engines or engines and Propellers or propellers from time to time installed thereon) subleased hereunder and identified in Sublease Supplement No. 1; and (ii) any and all Parts so long as

1

the same are incorporated or installed in or attached to the Aircraft or so long as title thereto remains vested in Swedish Lessor or, after termination of the Swedish Lease, U.S. Lessor, in accordance with the terms hereof after removal from the Aircraft.

"Airworthiness Certificate" shall mean the Standard Airworthiness Certificate on AC Form 8100-2 issued in respect of the Aircraft by the FAA.

"Base" shall mean the operational base of the Aircraft.

"Default" shall mean an event or occurrence which, with the giving of notice or the lapse of time or both, shall constitute an Event of Default.

"Engine" shall mean (i) each of the two General Electric CT7-9B aircraft engines described in Sublease Supplement No. 1 and originally installed on the Airframe, and (ii) any Replacement Engine from time to time substituted pursuant to Section 8.4 for an Engine subleased hereunder, together in each case with any Parts installed therein or attached thereto or any Parts removed therefrom so long as title thereto remains vested in Swedish Lessor or, after termination of the Swedish Lease, U.S. Lessor, in accordance with the terms hereof after removal from such Engine. Except as otherwise set forth herein, at such time as a Replacement Engine is so substituted, such replaced Engine shall cease to be an Engine hereunder.

"Event of Default" shall have the meaning set forth in Section 22.

"FAA" shall mean the United States Federal Aviation Administration or any successor U.S. Governmental body having safety regulatory jurisdiction over Sublessee.

"Governmental Body" shall mean any federal, state, municipal or other governmental subdivision, department, commission, board, bureau, court, legislature, agency, instrumentality or authority of any country, including, without limitation, the United States of America and the Kingdom of Sweden, domestic or, to the extent binding under federal law on any party or the Aircraft, international or transnational.

"Guarantor" shall mean Fairbrook, Inc., a Delaware corporation.

"Head Lessor Liens" shall mean the liens and legal processes of creditors of U.S. Lessor arising in connection with (i) breaches by U.S. Lessor of any of its obligations under any of the Operative Documents (as defined in the U.S. Lease), (ii) acts or obligations of U.S. Lessor not related to the transactions contemplated by the Operative Documents (as defined in the U.S. Lease) or (iii) taxes imposed upon U.S. Lessor and for which it is not indemnified pursuant to the Operative Documents (as defined in the U.S. Lease).

"Lien" shall mean any mortgage, pledge, lien, charge, encumbrance, lease, security interest or claim.

2

"Loan Agreement" shall mean Loan and Security Agreement No. 1 (Series A) dated as of April 10, 1990 between Swedish Lessor, National Westminster Bank PLC, as lender and Secured Party (the "Loan and Security Agreement"), as modified, amended or supplemented from time to time pursuant to the provisions thereof and the other U.S. Operative Documents (as defined therein).

"Loss" shall have the meaning set forth in Section 8.1.

"Loss Payment Date" shall, as to any Loss, mean the date on which Sublessee makes payment of the amount specified in Section 8.2, which date shall not be earlier than the Stipulated Loss Date or later than the earlier of (a) the date of receipt of insurance or other proceeds with respect to such Loss, or (b) the date ninety days from the Stipulated Loss Date for such Loss.

"Noteholders" shall mean the holders from time to time of the notes delivered by Swedish Lessor pursuant to Section 4.9 of the Loan Agreement, including any note delivered in exchange therefor or in replacement thereof.

"Operations Specifications" shall mean the FAA approved operations specifications of Sublessee for operation of the Aircraft, as in effect (whether or not amended) at any particular time during the term of this Sublease.

"Owner Participant" shall have the meaning given to such term in the Introduction to this Sublease.

"Owner Trustee Security Agreement" shall mean the Owner Trustee Security Agreement and Assignment No. 1 dated as of April 10, 1990 between U.S. Lessor and Secured Party, as from time to time amended or supplemented.

"Parts" shall mean all appliances, parts, instruments, appurtenances, accessories, furnishings and other equipment of whatever nature (other than complete Engines, engines, Propellers or propellers), from time to time installed in or attached to the Airframe or any Engine or Propeller.

"Propeller" shall mean (i) each of the two Dowty Rotol propellers described in Sublease Supplement No. 1 and originally installed on the Airframe, and (ii) any Replacement Propeller from time to time substituted pursuant to Section 8.4 for a Propeller leased hereunder, together in each case with any Parts installed therein or attached thereto or any Parts removed therefrom so long as title thereto remains vested in Swedish Lessor or, after termination of the Swedish Lease, U.S. Lessor, in accordance with the terms hereof after removal from such Propeller. Except as otherwise set forth herein, at such time as a Replacement Propeller is so substituted, such replaced Propeller shall cease to be a Propeller hereunder.

3

"Regulations" shall mean FAA regulations.

"Replacement Engine" shall mean a General Electric CT7-9B aircraft engine (or aircraft engine of the same manufacturer of the same or an improved model) that has a value or utility at least equal to such engine, which may be installed on the Airframe without impairing the value or utility of the Aircraft, which is certified for use on a Saab Model 340B passenger aircraft and which is subleased hereunder, together with all Parts relating to such engine.

"Replacement Propeller" shall mean a Dowty Rotol R390/4-123-F/27 propeller (or propeller of the same manufacturer of the same or an improved model) that has a value and utility at least equal to such propeller, which may be installed on the Airframe without impairing the value or utility of the Aircraft, which is certified for use on a Saab Model 340B passenger aircraft and which is leased hereunder, together with all Parts relating to such propeller.

"Secured Party" shall mean the party from time to time acting as secured party on behalf of each Noteholder under the Loan Agreement.

"Secured Party's Release Notice" shall mean the notice by Secured Party pursuant to Section 15 of the Loan Agreement that all amounts and all other obligations then payable under the Loan Agreement, under the Series A Notes and under all other Operative Documents (as defined in the Loan Agreement) to Secured Party, Lender and each Noteholder have been paid and performed in full and the Lien of the Loan Agreement and the Lien of the Owner Trustee Security Agreement have been released.

"Stipulated Loss Date" shall mean, for any Loss, the date specified for payment in Section 9(a) of the U.S. Lease.

"Stipulated Loss Value" for the Aircraft means the amount set forth in the Sublease Rent Schedule.

"Sublease" shall mean this Aircraft Sublease Agreement, as modified, amended or supplemented from time to time pursuant to the provisions hereof.

"Sublease Rent Schedule" shall means Schedule 1 to this Sublease.

"Sublease Supplement" shall mean each Sublease Supplement entered into from time to time substantially in the form attached as Exhibit A hereto.

"Sublessor Liens" shall mean liens with respect to the Aircraft arising out of (i) claims against Sublessor not related to the transactions contemplated by this Sublease, (ii) any act or omission of Sublessor which is not related to the transactions contemplated by this

4

Sublease or is in violation of any of the terms of the Sublease, (iii) claims against Sublessor with respect to taxes against which Sublessee is not required to indemnify Sublessor, (iv) claims against Sublessor arising out of any transfer by Sublessor, at a time when no Event of Default shall have occurred and be continuing, of all or any portion of the interest of Sublessor in the Aircraft or the Sublease; provided, however, that any lien which is attributable solely to Sublessor and would otherwise result from any of the above shall not be a lien prohibited by Section 18 so long as (1) the existence of such lien poses no material risk of seizure of the Aircraft, (2) the existence of such lien does not interfere in any way with the use or operation of the Aircraft by Sublessee pursuant to the terms hereof and (3) Sublessor is diligently contesting such lien.

"Supplemental Rent" shall mean all amounts, liabilities and obligations (other than Basic Rent) which Sublessee assumes or agrees to pay hereunder including, without limitation, Stipulated Loss Value, indemnities, any interest payable with respect to payments pursuant to Section 5(i) hereof (to the extent permitted by applicable law) and the "Usage Fee" specified in the Sublease Rent Schedule.

"Swedish Lessor" shall mean Swedish Aircraft Two KB, a limited partnership organized under the laws of the Kingdom of Sweden, as lessor of the aircraft to U.S. Lessor under Amended and Restated Aircraft Lease Agreement No. 1 dated as of April 10, 1990, as modified, amended or supplemented from time to time (the "Swedish Lease").

"U.S. Lease" shall have the meaning given to such term in the Introduction to this Sublease.

"U.S. Lessor" shall have the meaning given to such term in the Introduction to this Sublease.

3.    [Reserved.]

4.    Term. Except as otherwise provided herein, the term of this Sublease (the "Term") shall commence on the Delivery Date, which shall be the date of Sublease Supplement No. 1, and shall end on the date specified therefor in Sublease Supplement No. 1; provided that the Sublessee shall return the Aircraft, and the Sublease shall thereupon terminate, on any date that is after the first six (6) months of the Term, but no later than twelve (12) months after the Delivery Date, in the event either Sublessee or Sublessor gives the other written notice specifying such date of termination, which shall be no less than thirty (30) days after receipt of such notice.

5.    Rent. Sublessee agrees to pay to Sublessor monthly in advance, Basic Rent on the Basic Rent Payment Dates in the amounts set forth in the Sublease Rent Schedule. Notwithstanding the expiration, cancellation or other termination of Sublessee's obligation to pay Basic·Rent hereunder, Sublessee also agrees to pay to Sublessor, or to any other Person entitled thereto, any and all Supplemental Rent as the same becomes due and owing. Sublessee

5

shall pay to Sublessor as Supplemental Rent (i) interest on each overdue installment of rent and other sums due from the due date until paid in full at the late payment rate set forth in Sublease Supplement No. 1 and (ii) all other amounts required to be paid by Sublessee hereunder.    All rent shall be paid without Abatement by wire transfer of immediately available funds to Sublessor's account number 00004361 at Skandinaviska Enskilda Banken, 245 Park Avenue, New York, New York, ABA No. 026003036 or such other place as may be designated by Sublessor.

SUBLESSEE AGREES THAT ITS OBLIGATIONS TO PAY RENT AND ANY OTHER SUMS UNDER THIS SUBLEASE, AND THE RELATED RIGHTS OF SUBLESSOR IN AND TO SUCH RENT, ARE ABSOLUTE AND UNCONDITIONAL AND ARE NOT SUBJECT TO ANY ABATEMENT FOR ANY REASON WHATSOEVER, INCLUDING, WITHOUT LIMITATION, ABATEMENTS DUE TO ANY PRESENT OR FUTURE CLAIMS OF SUBLESSEE AGAINST SUBLESSOR UNDER THIS SUBLEASE OR OTHERWISE, AGAINST VENDOR, OR AGAINST ANY OTHER PERSON FOR WHATEVER REASON, INCLUDING, WITHOUT LIMITATION: (i) any default, misrepresentation, negligence, misconduct, or other action or inaction of any kind by Sublessor, U.S. Lessor, Owner Participant, Guarantor, Swedish Lessor, any Noteholder, Secured Party, any manufacturer or seller of any part of any Aircraft, Sublessee, or any other Person, whether under or in connection with this Sublease or any other agreement (including, without limitation, the failure of Sublessor to perform in accordance with the Sublease or the failure of U.S. Lessor or Owner Participant to perform in accordance with the U.S. Lease); (ii) the insolvency, bankruptcy, reorganization or cessation of existence, or discharge or forgiveness of indebtedness of, Sublessor; (iii) the invalidity, unenforceability, impossibility or illegality of performance of this Sublease or any other agreement for any reason; (iv) any defect in the title, condition, design, operation or fitness for use of, or any Lien or other restriction of any kind upon, all or any part of the Aircraft, any loss or destruction of, or damage to, the Aircraft, or any interruption in or cessation of the ownership, possession, operation or use of any thereof for any reason whatsoever; (v) any restriction, prevention or curtailment of or interference with the Aircraft or the use thereof or any part thereof for any reason whatsoever, including, without limitation, by any Governmental Body or under any applicable law; (vi) any exercise or non-exercise of any right or remedy under or in respect of the Sublease; or (vii) any other cause or circumstance foreseen or unforeseen, whether similar or dissimilar to any of the foregoing, any present or future law notwithstanding. SUBLESSEE ACKNOWLEDGES THAT IT UNDERSTANDS THIS PARAGRAPH TO MEAN THAT IT MUST PAY RENT AS PROVIDED IN THIS SUBLEASE WHETHER OR NOT SUBLESSEE HAS A MONETARY OR OTHER DISPUTE WITH SUBLESSOR OR ANY OTHER PERSON, AND THAT SUCH DISPUTES SHALL BE DISPOSED OF BY WHATEVER OTHER MEANS ARE AVAILABLE TO SUBLESSEE OUTSIDE OF THIS SUBLEASE. SUBLESSEE HEREBY WAIVES, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHTS WHICH IT MAY NOW HAVE OR WHICH AT ANY TIME HEREAFTER MAY BE CONFERRED UPON IT, BY STATUTE OR OTHERWISE, TO TERMINATE, CANCEL, QUIT OR SURRENDER THIS SUBLEASE EXCEPT IN ACCORDANCE WITH THE EXPRESS TERMS HEREOF. EACH

PAYMENT OF RENT MADE BY SUBLESSEE SHALL BE FINAL AND SUBLESSEE WILL NOT SEEK TO RECOVER ALL OR ANY PART OF ANY SUCH PAYMENT OF RENT FROM SUBLESSOR FOR ANY REASON WHATSOEVER.

6. <u>Disclaimer of Warranty; Subordination</u>. Sublessee acknowledges that, for purposes of this Sublease, neither Sublessor, U.S. Lessor, Guarantor, Swedish Lessor, Owner Participant nor any successor or assignee of Sublessor, U.S. Lessor, Guarantor, Swedish Lessor or Owner Participant is a manufacturer or vendor of the Aircraft, or the agent of either; that neither Sublessor, U.S. Lessor, Owner Participant or Swedish Lessor shall have any obligation to install, test, adjust or service the Aircraft; and that NEITHER SUBLESSOR, U.S. LESSOR, GUARANTOR, SWEDISH LESSOR, OWNER PARTICIPANT, SECURED PARTY, ANY NOTEHOLDER NOR ANY ASSIGNEE OR SUCCESSOR OF SUBLESSOR, U.S. LESSOR, GUARANTOR, SWEDISH LESSOR, SECURED PARTY, ANY NOTEHOLDER OR OWNER PARTICIPANT SHALL BE DEEMED TO HAVE MADE ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, IN FACT OR IN LAW, AS TO THE CAPACITY, AGE, DESCRIPTION, STATE, WORKMANSHIP, CONSTRUCTION, USE, PERFORMANCE, TITLE, VALUE, CONDITION, QUALITY, DESIGN, COMPLIANCE WITH SPECIFICATIONS, OPERATION, DURABILITY, MERCHANTABILITY, SUITABILITY OF THE AIRCRAFT OR ANY ENGINE, PROPELLER OR PART OR THEIR FITNESS FOR ANY USE OR PURPOSE OR AS TO THEIR AIRWORTHINESS, AS TO THE ABSENCE OF LATENT OR OTHER DEFECTS, WHETHER OR NOT DISCOVERABLE, AS TO THE ABSENCE OF ANY INFRINGE-MENT OF ANY PATENT, TRADEMARK OR COPYRIGHT, OR AS TO THE ABSENCE OF ANY OBLIGATIONS BASED ON STRICT LIABILITY IN TORT, OR ANY OTHER REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO THE AIRCRAFT OR ANY PORTION THEREOF, IT BEING AGREED AMONG SUBLESSEE AND SUBLESSOR THAT ALL RISKS INCIDENT TO THE FORE-GOING ARE TO BE BORNE BY SUBLESSEE AND THAT SUBLESSOR AND U.S. LESSOR, SECURED PARTY, ANY NOTEHOLDER, OWNER PARTICIPANT AND SWEDISH LESSOR SHALL HAVE NO LIABILITY OR RESPONSIBILITY WITH RESPECT THERETO.

This Sublease, and the Sublessee's rights hereunder to the possession, use and enjoyment of the Aircraft are and shall be subject and subordinate to all of the terms of the U.S. Lease and the rights of the U.S. Lessor under the U.S. Lease, of Swedish Lessor under the Swedish Lease, and of Secured Party under the Loan Agreement and under the Owner Trustee Security Agreement, as more specifically described in the Acknowledgment and Consent Agreement delivered by Sublessee in respect of this Sublease, including, without limitation, the U.S. Lessor's rights to repossession under the U.S. Lease and to avoid, cancel or terminate this Sublease for any reason upon such repossession or after an event of default by the Sublessor under the U.S. Lease (a "Repossession Event"), and Sublessee agrees upon a Repossession Event to surrender possession of the Aircraft upon written demand therefor by or on behalf of U.S. Lessor. Nothing in this paragraph shall be construed to limit Sublessee's rights as against Sublessor hereunder if

Sublessee's right to possess the Aircraft hereunder is terminated because of a Repossession Event. To the extent not accomplished by Sublessor's assignment of this Sublease and the rents due and payable to Sublessor hereunder, if any of U.S. Lessor, Secured Party or Swedish Lessor declares the U.S. Lease to be in default, Sublessor agrees that its rights under this Sublease (other than indemnities payable to Sublessor by Sublessee and not also payable by Sublessor to U.S. Lessor), shall automatically be deemed assigned to U.S. Lessor, or, prior to delivery of Secured Party's Release Notice, to Secured Party, or after delivery of Secured Party's Release Notice but prior to termination of the Swedish Lease, to Swedish Lessor.

7.    Insurance. At all times during the term of this Sublease, Sublessee shall maintain or cause to be maintained comprehensive airline liability insurance, including but not limited to aircraft liability, passenger legal liability, property damage and cargo liability insurance with respect to the Aircraft of the type carried and covering risks customarily insured against by corporations engaged in the business of air transportation in the United States using aircraft similar to the Aircraft, with limits no less than the higher of $100,000,000 or standard industry practice for Sublessee's segment of the industry for comparable aircraft, with a deductible not in excess of $100,000 per occurrence. Each liability policy shall be primary without right of contribution from other insurance carried by Sublessor, U.S. Lessor, Swedish Lessor, Guarantor, Secured Party or any other person, and shall expressly provide that all provisions, except limits of liability, shall operate in the same manner as if there were separate policies covering each insured.

At all times during the Term of this Sublease, Sublessee shall maintain or cause to be maintained all risk ground and flight aircraft hull insurance for the Aircraft, including non-political hijacking coverage, fire, transit and extended coverage on each Engine or Propeller which is removed from the Aircraft. At any time when the Aircraft is to be operated in any country other than the United States or Canada, Sublessee shall maintain or cause to be maintained war risk, hijacking (political and non-political), governmental confiscation and expropriation insurance, in each case of the type carried and covering risks customarily insured against by corporations engaged in the business of air transportation in the United States using aircraft similar to the Aircraft, provided, however, that the Aircraft may be operated in any country not listed herein without the specified additional coverage if Sublessor (or, if prior to delivery of the Secured Party's Release Notice, Secured Party) has given its prior written consent to such operation. Additionally, Sublessee shall maintain or cause to be maintained war risk, hijacking (political and non-political), governmental confiscation and expropriation insurance, as provided in the preceding sentence, when the Aircraft is to be operated in any country listed in the preceding sentence, if Sublessor reasonably requests such insurance coverage based on its assessment of the risk at that time of war, hijacking (political and nonpolitical), governmental confiscation or expropriation, provided that Sublessor shall not request governmental confiscation or expropriation insurance with respect to the operation of the Aircraft in the United States. All such insurance shall be for an amount not less than the required Stipulated Loss Value from time to time and may be subject to a deductible not in

8

excess of $100,000 per occurrence.

The Swedish Lessor, Guarantor, U.S. Lessor, Owner Participant, Sublessor, any Noteholder and the Secured Party may insure the Airframe and any Engine or Propeller and its interest therein. Any insurance so maintained shall not result in a reduction of coverage required to be maintained by Sublessee under this Sublease, it being understood that the proceeds or any such insurance shall not be governed by the terms of this Sublease.

All insurance which Sublessee is required by this Sublease to carry or cause to be carried shall be placed with insurers acceptable to Sublessor and shall be in full force and effect throughout any area at any time traversed by an Aircraft. Payments for losses shall be made in lawful currency of the United States in the United States.

Prior to the Delivery Date, and on each renewal date of the policy, Sublessee shall provide to each of Sublessor, Guarantor, U.S. Lessor, Owner Participant, Swedish Lessor, each Noteholder and Secured Party a certificate of insurance ("Certificate") from a reputable aircraft insurance broker, which Certificate shall be acceptable to each such Person, stating the exact dates, coverages and details of coverage for the Aircraft, by serial number, including the endorsements described in clause (ix) of the next paragraph. In addition, on each such date, Sublessee shall provide or cause to be provided the endorsements set forth in Exhibit B hereto, executed by the lead underwriter or managing underwriter for the insurance carriers with respect to the Aircraft and such insurance coverages. On each such date, Sublessee shall (to the extent that reputable insurance brokers will then perform such service) cause Sublessee's insurance broker to provide to Sublessor, Guarantor, U.S. Lessor, Owner Participant, Swedish Lessor, each Noteholder and Secured Party a second certificate signed by an officer or partner stating that the broker has reviewed this Section 7, and the insurance policy for which the Certificate was issued provides no less than the coverage required by this Section 7. If Sublessee is unable to provide the foregoing broker's certificate, Sublessee will, at Sublessor's request, deliver to Sublessor, Guarantor, U.S. Lessor, Owner Participant, Swedish Lessor, each Noteholder and Secured Party certified copies of all relevant insurance policies. Sublessee shall cause such firm to advise Sublessor, Guarantor, U.S. Lessor, Owner Participant, Swedish Lessor, each Noteholder and Secured Party promptly of any default in the payment of premium or any other event or circumstance that might invalidate, in whole or in part, any insurance on the Aircraft.

Any policies required hereunder shall: (i) name Sublessor, Guarantor, Owner Participant, U.S. Lessor, Swedish Lessor, each Noteholder and Secured Party (and, until at least May 1, 1999 AMR Leasing Corporation, Simmons Airlines, Inc., Executive Airlines, Inc., American Airlines, Inc. and AMR Corporation) as additional insureds; including all officers, directors, employees and shareholders of each of the foregoing; and warranted that none of the foregoing has any operational interest in the Aircraft;(ii) be made payable in the case of policies covering loss or damage to any Aircraft, Engine or Propeller solely to Secured Party until delivery by Secured Party of the Secured Party's Release Notice; thereafter until termination of the Swedish Lease, Swedish Lessor, and

thereafter solely to U.S. Lessor; (iii) provide that no lapse, cancellation, or material change shall become effective until 30 days (or, with respect to war risk insurance, such shorter period as is the custom on the London market) after mailing of notice to U.S. Lessor, Guarantor, Owner Participant, Swedish Lessor, each Noteholder, Sublessor and, until delivery of the Secured Party's Release Notice, Secured Party; (iv) provide that losses shall be adjusted with Sublessee subject to approval of Sublessor and U.S. Lessor and any loss payee; (v) provide that the interests of U.S. Lessor, Guarantor, Sublessor, Owner Participant, Swedish Lessor, each Noteholder and Secured Party shall not be invalidated by the actions or inactions of Sublessee or any other person (except U.S. Lessor, Guarantor, Owner Participant, Swedish Lessor, any Noteholder, Sublessor or Secured Party, any additional insured or loss payee, and then only against such person); (vi) insure U.S. Lessor, Owner Participant, Guarantor, Swedish Lessor, each Noteholder, Secured Party, Sublessor and each additional insured regardless of any breach or violation of any warranties, declarations, or conditions contained in such policies by Sublessee or any other person (other than U.S. Lessor, Guarantor, Owner Participant, Swedish Lessor, any Noteholder, Secured Party, Sublessor or any additional insured, and then only against such person); (vii) provide that the insurer shall waive any rights of (a) set-off, counterclaim or deduction it may have against U.S. Lessor, Guarantor, U.S. Lessor Participant, Sublessor, Swedish Lessor, any Noteholder, Secured Party, Sublessee or other insureds except for premiums due from the named insured under any such policy and (b) subrogation against U.S. Lessor, Guarantor, Owner Participant, Sublessor, Swedish Lessor, each Noteholder, Secured Party, additional insureds or any loss payee; (viii) provide that neither U.S. Lessor, Sublessor, Swedish Lessor, any additional insured nor any loss payee shall have any obligation for premiums, commissions or other payments in connection with such insurance; and (ix) contain the endorsements set forth in Exhibit B. No coverage shall be provided for any additional insured with respect to any claim arising out of any legal liability of an additional insured as a manufacturer, repairer, supplier or servicing agent, other than financial services. Upon request by Sublessor, Sublessee will cause such policies to be amended to name transferees and assignees of U.S. Lessor, Guarantor, Owner Participant, Swedish Lessor or Secured Party as additional insureds or loss payees, and grant to such persons rights equivalent to U.S. Lessor's, Guarantor's, Owner Participant's, Swedish Lessor's or Secured Party's rights with respect to such insurance, as Sublessor may reasonably request.

8.     Loss or Damage to Aircraft. Upon signing Sublease Supplement No. 1, Sublessee assumes, as between Sublessor and Sublessee, the entire risk of any Loss of or damage, from any cause whatsoever within or beyond the control of Sublessee, to the Aircraft. Sublessee shall promptly report any Loss or damage to Sublessor, each additional insured and loss payee and all concerned governmental agencies and shall promptly report any damage covered by insurance to the insurance companies.

8.1     A "Loss" (as used in this Section 8) shall occur with respect to the Aircraft, Airframe, Engine or Propeller when either: (i) the item has been lost or stolen for a period of more than the lesser of 60 days or the remainder of the term of the U.S. Lease; (ii) insurance proceeds have been received on the basis of a total loss or constructive total loss of the item; (iii) the item has been destroyed, irreparably damaged or rendered unfit for use for any reason

10

whatsoever; (iv) title to the item has been requisitioned by a Governmental Body; (v) use of the item has been requisitioned by a United States Governmental Body for a period longer than the lesser of six months or the remainder of the term of the U.S. Lease with respect thereto or by any non-United States Governmental Body for any period; or (vi) as a result of any rule, regulation, order or other action (generally applicable to aircraft of the same type as the Aircraft) by the FAA, the Department of Transportation or other Governmental Body (including any court) having jurisdiction, the use of such property in the normal course of air transportation of persons is prohibited for a period of 12 consecutive months, unless Sublessee, prior to the expiration of such 12 month period, undertakes and is diligently carrying forward all steps necessary or desirable to permit the normal use of such property by Sublessee or, in any event, if such use is prohibited for a period of 18 months or beyond the end of the term of the U.S. Lease.

8.2     When there is a Loss of the Aircraft (or the Airframe thereof), Sublessee shall, on the Loss Payment Date for such Loss, pay or cause to be paid to or at the direction of Sublessor in immediately available funds: (i) the Stipulated Loss Value as of the Stipulated Loss Date for such Loss, (ii) Basic Rent (if any) payable on such Stipulated Loss Date, and (iii) all Supplemental Rent due as of such date. When Sublessor receives the sum of (i) and (ii) above, Sublessor will exercise such rights as Sublessor may have to cause the appropriate party to transfer to Sublessee, as-is, where-is, all of the appropriate party's right, title and interest, if any, in and to the relevant item, without recourse or warranty except that the item is free and clear of any Head Lessor Liens.

8.3     If the Aircraft is damaged but is not a Loss, Sublessee shall, as promptly as practicable, notify U.S. Lessor, Swedish Lessor, Owner Participant, Secured Party and Sublessor and at Sublessee's expense repair and restore the item to the condition required by this Sublease and shall promptly notify U.S. Lessor, Swedish Lessor, Owner Participant, Sublessor and Secured Party upon completion of such repairs. So long as no Default or Event of Default exists, Sublessee shall be entitled to receive the entire award, judgment, settlement, insurance proceeds or payments with respect to damage not constituting a Loss to the extent received by Secured Party, Sublessor or U.S. Lessor upon receipt of certification from Sublessee that the property so damaged has been repaired or replaced in full and the cost of such repair or replacement has been paid in full.

8.4     Notwithstanding anything to the contrary in this Section 8, if there is a Loss of an Engine or Propeller where there is no Loss of the Aircraft as a whole, Sublessee shall within 30 days of the occurrence of such Loss convey to Swedish Lessor or, after termination of the Swedish Lease, to U.S. Lessor, title to a Replacement Engine or Replacement Propeller. Such Replacement Engine or Replacement Propeller shall be free and clear of all Liens other than Liens permitted by this Sublease and shall be in the same or better condition as the Engine or Propeller as to which such Loss occurred had it been in the condition required by this Sublease. With regard to the Replacement Engine or Replacement Propeller, Sublessee shall at its expense: (i) furnish to Swedish Lessor or, after termination of the Swedish Lease, to U.S. Lessor, a bill of sale satisfactory to U.S. Lessor, Swedish Lessor, Owner Participant,

11

Sublessor and the Secured Party, (ii) execute and record a supplement to this Sublease, satisfactory to Sublessor, subjecting the replacement to the terms of this Sublease, (iii) furnish U.S. Lessor, Swedish Lessor, Owner Participant, Sublessor and the Secured Party with evidence satisfactory to Sublessor of Sublessee's title to the replacement and of compliance with the insurance provisions of Section 7, and (iv) take such other action (including without limitation the delivery of legal opinions) as U.S. Lessor, Swedish Lessor, Owner Participant, Sublessor and Secured Party may reasonably request so that the replacement shall be properly titled to Swedish Lessor or, after termination of the Swedish Lease, to U.S. Lessor and subjected to the Swedish Lease, the U.S. Lease and this Sublease and the Lien of the Loan Agreement and the Owner Trustee Security Agreement, to the same extent as the Engine or Propeller as to which such Loss occurred. Upon full compliance by Sublessee with the terms of this Section 8, Sublessor will exercise such rights as it may have to cause the appropriate party to transfer to Sublessee any title that such party has to the Engine or Propeller as to which such Loss occurred, without recourse or warranty except that the same is free and clear of any Head Lessor Liens.

8.5   Upon the occurrence of any Loss, Secured Party shall receive the entire insurance or other award, judgment, settlement proceeds or payments with respect thereto. Sublessee hereby assigns to Secured Party any right or interest Sublessee may have or may acquire in any such award or payment; _provided_ that unless a Default or Event of Default exists, Sublessee shall be entitled to credit or reimbursement for the amount of such award, judgment, settlement, insurance proceeds or payments actually received by Secured Party against Sublessee's obligation to pay the Stipulated Loss Value due for the Aircraft or for the purchase price of a replacement engine or a replacement propeller and Sublessor (or its designee) shall be entitled to the excess, if any, of such amounts over such Stipulated Loss Value or purchase price.

9.   <u>General Tax Indemnity</u>

9.1   <u>Taxes Indemnified</u>.   Subject to the exclusions stated in Section 9.2 below, Sublessee agrees to indemnify, defend and hold harmless the Sublessor from and against any and all taxes, fees, and other governmental charges (including sales, use, excise, personal property, and other taxes), however imposed or asserted, by any Federal, state or local government, political subdivision, or taxing authority in the United States, or by any government or taxing authority of or in a foreign country, to the extent upon or with respect to or in connection with, or based upon or measured by, in whole or in part: (i) the Aircraft, the Engines, or any part of any of the foregoing or interest therein, (ii) the purchase, financing, ownership, delivery, leasing, possession, use, operation, return, storage, transfer of title, sale, acceptance, rejection or other disposition or action or event with respect to the Aircraft, the Engines, or any part of any of the foregoing or interest therein; (iii) the rentals, receipts, income or earnings arising from the Sublessee's purchase, financing, ownership, delivery, leasing, possession, use, operation, return, storage, transfer of title of the Aircraft, the Engines, or any part of any of the foregoing or interest therein, or (iv) this Sublease or amendments or supplements hereto, their execution or the transactions contemplated hereby

12

("Taxes").

9.2   Taxes Excluded. The indemnity provided for in Section 9.1 shall not extend to any of the following:

(i)(a)  Taxes on, based upon or measured by gross or net earnings or income or gross or net receipts (including any capital gains tax Or minimum taxes) or that are franchise Taxes, Taxes on doing business of Taxes on, based on or measure by capital or net worth of Sublessor, (b) Taxes imposed by any taxing authority or governmental subdivision of a country other than the United States, or (c) Taxes imposed prior and unrelated to delivery of the Aircraft;

(ii)   Taxes in connection with the sale of the Aircraft upon termination of the term of this Sublease and return of the Aircraft by Sublessee;

(iii)   Taxes imposed on or with respect to the Sublessor resulting from (x) any voluntary transfer by or to the Sublessor of any interest in the Lease, the Aircraft, any Engine or any part thereof other than a transfer pursuant to the exercise of remedies while an Event of Default shall have occurred and be continuing, or (y) any involuntary transfer of the Aircraft or any Engine or any part relating thereto in connection with any bankruptcy or similar proceeding for the relief of debtors in which the Sublessor is the debtor or any foreclosure by a creditor of the Sublessor with respect thereto;

(iv)   Any interest, penalties or additions to tax imposed on the Sublessor that would not have resulted but for the failure of the Sublessor to register, make deposits or file any return properly and timely (unless such failure results from the failure of the Sublessee to provide proper and timely information to the Sublessor under Section 15(b));

(v)   Taxes resulting from the Sublessor's negligence gross or willful misconduct or the inaccuracy or breach of any representation, warranty, covenant or agreement by Sublessor in this Sublease;

(vi)   Taxes which would not have been imposed but for a present or future connection between Sublessor and the jurisdiction imposing such taxes (including, without limitation, Sublessor being or having been a citizen or resident thereof, or being or having been organized, present or engaged in a trade or business therein, or having or having had, a permanent establishment or fixed place of business therein, or engaging or having engaged in one or more transactions therein unrelated to this Sublease), other than a connection arising by reason of the transaction completed by this Sublease;

(vii)   Any tax attributable to the Aircraft that is imposed with respect to any period prior to the effective date of this Sublease or after (a) the expiration of the

13

term of this Sublease in accordance with the provisions of Section 3 hereof, or the earlier termination of this Sublease, (b) the return of possession pursuant to the terms of this Sublease, or (c) the commencement of storage pursuant to this Sublease, provided, however that the exclusion set forth in this paragraph shall not apply to any taxes relating to events occurring or matters arising after the effective date of this Sublease but prior to or simultaneously with such expiration;

(viii)   Taxes to the extent imposed as a result of Sublessor's failure to comply with any certification, information, documentation, reporting, registering or similar procedure that is required by law, treaty or regulation as a condition to the allowance of any reduction in the rate of such Taxes or any exemption or other relief from such Taxes; provided that the compliance with such requirement does not have a material adverse effect upon Sublessor; or;

(ix)   Taxes imposed on or with respect to a transferee (or subsequent transferee) of Sublessor to the extent such Taxes would not have been required to be withheld or imposed on or with respect to Sublessor.

9.3   Payments on an After-Tax Basis, etc.   The amount Sublessee shall be required to pay with respect to any tax indemnified against under this Section 9 shall be an amount sufficient, on an after-tax basis (after taking into account all federal, state, local and foreign income tax detriments incurred by the Sublessor in connection with the receipt or accrual of such indemnity and all federal, state, local and foreign income tax benefits on account of deductions or credits currently realized by the Sublessor as a result of the payment of any amounts for which the Sublessee will have indemnified the Sublessor), to restore Sublessor to the same position the Sublessor would have been in had such tax not been incurred.  If the Sublessor receives any refund of a tax for which it has been indemnified hereunder (or any interest thereon), or realizes and actually utilizes any future tax benefit that is attributable to a tax for which it has been indemnified hereunder, the Sublessor shall pay to the Sublessee an amount (but not in excess of the aggregate amount theretofore received from (and not repaid to) the Sublessee) which, when increased by the amount of any additional tax benefit that the Sublessor realizes as a result of the payment made pursuant to this sentence, equals the amount of such refund, interest or future tax benefit.

9.4   Procedures.   Any amount payable to the Sublessor pursuant to this Section 9 shall be paid within 30 days after receipt of a written demand therefor from the Sublessor accompanied by a written statement describing in reasonable detail the basis for such indemnity and the computation of the amount so payable, provided that such amount not be paid prior to the earlier of the time such taxes are paid or, in the case of amounts which are being contested by Sublessee in good faith or by the Sublessor pursuant to Section 9.5 hereof, the time such contest is finally resolved.  Within 15 days following Sublessee's receipt of the computation of the amount of the indemnity, Sublessee may request that an independent accounting firm, to be jointly selected by Sublessee and Sublessor, determine whether such computations are correct, and, if it is determined that such computations are incorrect,

14

compute the correct amount. The computations of such accounting firm shall be final, binding and conclusive upon the parties. The Sublessor shall make available to any such accounting firm on a confidential basis all such books, records, tax returns and other information which the accounting firm reasonably requests in order to complete such computations. Sublessee shall have no right to inspect the books, records or tax returns of Sublessor to verify such computation All fees and expenses payable under this Section 9 in connection with such verification shall be borne by Sublessee unless such verification discloses an error adverse to Sublessee in an amount greater than 10% of the amount calculated by the Sublessor in which case such fees and expenses shall be borne by Sublessor.

9.5     Contest.   If a written claim is made against Sublessor for taxes with respect to which Sublessee is liable for payment or indemnity hereunder, Sublessor shall give Sublessee notice in writing of such claim within 15 days after its receipt and shall furnish Sublessee with copies of any requests for information from any taxing authority relating to such taxes with respect to which Sublessee may be required to index hereunder. If requested by the Sublessee within 30 days after its receipt of such notice, the Sublessor shall (to the extent that such tax can be contested in the name of the Sublessee) permit the Sublessee, at its expense, to contest such tax in the name of the Sublessee, and otherwise, the Sublessor shall either, at the Sublessor's option, permit the Sublessee to contest or itself contest in good faith (including by pursuit of appeals), the validity, applicability or amount of such taxes by resisting payment, or through payment under protest if necessary and proper, or by using reasonable efforts to obtain a refund thereof in appropriate administrative and judicial proceedings (including an appeal, provided that the amount in issue might give rise to an indemnity payment of at least $25,000 and further provided that Sublessee shall furnish an opinion of independent counsel reasonably satisfactory to the Sublessor) Sublessor shall provide to Sublessee, on a confidential basis, all books, records, tax returns and other information as may be reasonably required by Sublessee to contest such taxes.

Notwithstanding the foregoing provisions of this Section 9, the Sublessor shall not be required, nor the Sublessee permitted, to take any action with respect to a contest if it shall be reasonably determined by the Sublessor that the action to be taken will result in a material danger of sale, forfeiture or material loss with respect to the Aircraft, an Engine, or any part of the foregoing or interest therein and shall not be required to take any action unless and until Sublessee shall have agreed to pay the Sublessor on demand all reasonable out-of-pocket costs and expenses which Sublessor may incur in connection with contesting such taxes The parties further agree that Sublessor may at any time decline to take further action with respect to the contest of any claim for a tax, provided, however, that in such case Sublessor shall waive its rights to any indemnity payment otherwise payable pursuant to this Section 9 in respect of such claim, and shall reimburse the Sublessee for amounts, if any, previously paid by the Sublessee to the Sublessor in connection with such claim, and shall pay to the Sublessee (if such amounts are not reimbursed within one year from the date of receipt by the Sublessor) interest on any such amounts at the rate of interest--which would have been paid by the taxing authority had the contest been successfully resolved in favor of the Sublessor.

15

10.   <u>General Indemnity.</u>   Except to the extent attributable to (a) the willful misconduct, gross negligence or breach of the representations, warranties or obligations of Sublessor, (b) acts or events which occur prior to the delivery of the Aircraft to Sublessee or after the earliest to occur of (i) the return of possession of the Aircraft pursuant to Section 19 hereof, (ii) the payment by Sublessee of all amounts required to be paid under this Sublease following an Event of Default, (iii) the expiration of the Term of this Lease as stated in Section 4 hereof, (c) the creation or existence of a lien in violation of the provisions of Section 11 hereof, or (d) the disposition by Sublessor (voluntary or involuntary) of all or any part of its interest in the Aircraft (other than in accordance with the requirements of this Sublease or as the result of the occurrence of an Event of Default hereunder), Sublessee shall indemnify Sublessor and save, protect, defend and hold Sublessor and its employees and agents harmless from any and all liability, loss, damage, expense (including legal expenses and reasonable attorneys' fees, but excluding corporate overhead costs and expenses and (except pursuant to the next paragraph) Taxes, whether or not indemnified against pursuant to Section 9), causes of action, suits, claims or judgments arising from injury to person or property, resulting from or based upon Sublessor's leasing of the Aircraft, or the actual or alleged selection, control, use, operation, maintenance, possession, delivery or transportation of the Aircraft or its location or condition; and shall, at Sublessee's own cost and expense, defend any and all suits which may be brought against Sublessor, either alone or in conjunction with others, upon such liability or claim(s).

The amount Sublessee shall be required to pay with respect to anything indemnified against under this Section 10 shall be an amount sufficient, on an after-tax basis (after taking into account all Federal, state and local and foreign income tax effects on Sublessor), to restore Sublessor to the same position the Sublessor would have been in had the expense indemnified not been incurred. Sublessee shall satisfy, pay and discharge any and all judgments and fines that may be recovered against Sublessor in any such action(s)); provided, however, that Sublessor shall have given Sublessee written notice of any such claim or demand promptly after receiving notice thereof; failure by Sublessor to give such notice, however, shall not limit Sublessee's obligations hereunder, unless (and only to the extent that) Sublessee has been damaged by such failure to give notice. If Sublessee shall pay any amount to Sublessor pursuant to this Section 10 and Sublessor shall subsequently be reimbursed in respect of such indemnified amount from any other person or any other source whatsoever, Sublessor shall thereafter promptly pay an amount equal to the amount of such reimbursement to Sublessee. The provisions of this section shall survive termination of this Sublease.

11.   <u>Ownership: Liens.</u>   Sublessor and Sublessee agree that for all purposes this Sublease is, and is intended to be, a lease and that Sublessee does not hereby acquire any right, title, interest or equity in or to the Aircraft, except the right to use it under the terms provided. Sublessee at its own cost and expense will protect and defend the interests of Swedish Lessor, U.S. Lessor and Sublessor against all Liens and legal processes of creditors of Sublessee and other persons and shall keep all Aircraft free and clear from all such Liens and processes; <u>provided, however</u>, that Sublessee shall not be so obligated with respect to Sublessor Liens or

Head Lessor Liens.

Other than U.S. Lessor's rights, Sublessor's rights, Swedish Lessor's rights, Sublessor Liens, Head Lessor Liens and the Lien created pursuant to the Loan Agreement and the Owner Trustee Security Agreement, Sublessee shall not directly or indirectly create, incur or suffer to exist any Lien on the whole or any part of the Aircraft, this Sublease or title thereto, except those created by (i) the pooling arrangements referred to in Section 21, (ii) Liens for taxes either not yet due or being contested in good faith (and for the payment of which adequate reserves have been provided), so long as they do not involve risk of sale, forfeiture or loss on the whole or any part of the Aircraft, and (iii) mechanics, materialmen or other like liens arising in the ordinary course of business, not yet due or being contested in good faith (and for the payment of which adequate reserves have been provided), so long as they do not involve risk of sale, forfeiture or loss of the whole or any part of the Aircraft. Sublessee shall provide a bond or other security, upon the reasonable request of Sublessor covering the amount of any Lien described in clauses (ii) and (iii) of this paragraph.

12.   <u>Net Lease; Fuel, Storage Charges and Other Expenses</u>. This Sublease is an absolutely net lease and, without limiting the generality of the foregoing, Sublessee shall furnish for the Aircraft at its own expense all fuels, lubricants, oils and other materials necessary for their maintenance and operation, shall pay all storage and hangar charges, shall keep the Aircraft in good condition and shall otherwise maintain the Aircraft so that they will present a neat appearance at all times.

13.   <u>Identification Plates</u>. Sublessee shall firmly affix to the Airframe and each Engine in a conspicuous place, a decal or metal plate to be supplied by Sublessor, indicating the interests of Swedish Lessor, U.S. Lessor and Secured Party in the Aircraft and Engines.

14.   <u>Location, Possession and Use of Aircraft</u>.

(a)   At all times during the term of this Sublease, the Base for the Aircraft shall be either Minneapolis, Minnesota or Detroit, Michigan or such other location in the United States of which Sublessor has been advised. Sublessee shall not, without Sublessor's prior written consent, deliver, transfer, sub-sublease or relinquish possession or control of any Aircraft or any component thereof (except to the extent, if any, permitted under Section 21).

(b)   Sublessee further agrees (i) at all times to cause the Aircraft to be duly registered in the name of U.S. Lessor under the Transportation Code of 1994, as amended, and the Regulations, and (ii) that at no time shall the Aircraft be used, maintained or operated outside of the United States or Canada, or in any area for any purpose or in any manner which may expose Sublessee, U.S. Lessor, Swedish Lessor, any Noteholder, Guarantor, Owner Participant, Sublessor or Secured Party to any criminal or material civil penalty, fine, sanction, or other liability. Nor shall the Aircraft be used, maintained or operated in any trade, business or transaction which is, or may be declared to be, illegal or which shall or may subject such Aircraft to confiscation, seizure, detention or destruction. Under all

17

circumstances, Sublessee shall comply with all laws and governmental regulation, domestic and foreign applicable to the Aircraft and its use, maintenance and operation.

(c)   Sublessee shall not use, maintain or operate, or permit the Aircraft to be used, maintained or operated for any purpose or in any area or manner excepted from, or contrary to, any required insurance policy for the Aircraft. Nor shall the Aircraft be used, maintained or operated for any purpose or in any area or manner which could reasonably be expected to invalidate or limit any insurance policy or which could cause U.S. Lessor's, Swedish Lessor's, Secured Party's or Sublessor's interest to the Aircraft to be jeopardized, made unenforceable or unperfected or invalid as against Sublessee or any third party.

15.   Operation, Maintenance and Modification.

(a)   Generally.  Sublessee shall operate, maintain, possess, service, repair, overhaul and make alterations, modifications and additions to the Aircraft in compliance with all FAA, Federal, state and local laws and regulations and shall maintain the Aircraft (a) in accordance with all FAA requirements, (b) in good operating condition, (c) in the same condition as when delivered to Sublessee hereunder (ordinary wear and tear excepted), (d) so as to keep the Aircraft's Airworthiness Certificate in good standing at all times, (e) in the same manner and with the same care used by Sublessee with respect to similar equipment operated by it to the extent such standards exceed the above, (f) so as to maintain in full force and effect all warranties of manufacturers and suppliers of the Aircraft and its components and (g) in accordance with Sublessee's FAA-approved maintenance program. Sublessee shall comply with all issued FAA and manufacturer mandatory bulletins and all published manuals for the Aircraft.  All inspections, repairs, modifications, maintenance and overhaul work shall be performed at Sublessee's expense by properly licensed personnel and shall be in accordance with applicable manufacturer's and FAA standards.

(b)   Records; Information.   Sublessee shall maintain or cause to be maintained all records, logs and other materials required by the United States Department of Transportation or the FAA to be maintained in respect of each Aircraft and shall promptly furnish to Sublessor, Swedish Lessor or U.S. Lessor upon request such information as may be required to enable Sublessor, Swedish Lessor or U.S. Lessor to file any reports required to be filed with any governmental authority because of Sublessor's, Swedish Lessor's or U.S. Lessor's interest in the Aircraft.

(c)   Replacement of Parts.   Sublessee will promptly replace all Parts that may from time to time become worn out, lost, stolen, destroyed, seized, confiscated, damaged beyond repair or permanently rendered unfit to use for any reason whatsoever. In addition, Sublessee may remove in the ordinary course of maintenance, service, repair, overhaul or testing, any Parts whether or not worn out, lost, stolen, destroyed, seized, confiscated, damaged beyond repair or permanently rendered unfit for use; provided that Sublessee will repair and reinstall or replace such Parts as promptly as possible. All replacement Parts shall be free and clear of all Liens (except to the extent permitted by Section 21), and shall be in as

18

good operating condition as, and shall have a value and utility, remaining useful life, and performance and durability characteristics at least equal to, the Parts replaced based upon the assumption that such replaced Parts were in the condition and repair required to be maintained by the terms hereof. All such Parts at any time removed from the Aircraft shall remain subject to the Lien of the Loan Agreement and the Owner Trustee Security Agreement, and the rights of Swedish Lessor, U.S. Lessor and Sublessor and subject to the Swedish Lease, the U.S. Lease and this Sublease no matter where located, until such Parts are replaced by Parts that have been incorporated or installed in or attached to such Aircraft and that meet the requirements for replacement Parts specified above. Immediately upon any replacement Part becoming incorporated or installed in or attached to any Aircraft, as above provided, without further act, (i) title to the replaced Part shall thereupon vest in Sublessee, free and clear of all rights of Sublessor, Swedish Lessor, and U.S. Lessor, and shall no longer be deemed a Part hereunder, (ii) title to such replacement Part shall thereupon vest in Swedish Lessor (subject to Swedish Lease) or, after termination of the Swedish Lease, in U.S. Lessor, free and clear of all liens (except liens created by a pooling arrangement permitted by Section 21), and (iii) such replacement Part shall become subject to the U.S. Lease, the Swedish Lease and this Sublease and be deemed Part of such Aircraft for all purposes hereof to the same extent as the Part originally incorporated or installed in or attached to such Aircraft.

(d)   Alterations-Generally. Sublessee shall not make any alterations to the Aircraft not required to be made hereunder in excess of $75,000.00 per alteration without the prior written consent of Sublessor and no alteration shall diminish the value, utility, remaining useful life, condition or performance and durability characteristics of such item or convert the Aircraft to a cargo aircraft. Any such alteration shall become an integral part of the Aircraft and its cost shall not be reimbursed to Sublessee nor used by Sublessee as an offset for any amounts owed or to be owed to Sublessor for the Aircraft.

(e)   Additions-Severable; Nonseverable. All parts, accessories and other items of property which become attached and which cannot be readily removed without impairing the value or functional utility of the Aircraft shall immediately become the property of U.S. Lessor at no cost, and shall be subject to the terms of the U.S. Lease and this Sublease and may be removed at the end of the term of this Sublease only with the written consent of Sublessor. Any parts, accessories and other items of property which become attached and which are readily removable shall become property of U.S. Lessor at no cost upon expiration or early termination of this Sublease if not theretofore removed, provided, however, that Sublessee shall have no right to remove any such part, accessory or other item of property at any time that a Default or an Event of Default has occurred and is continuing.

16.   Performance of Sublessee Obligations by Sublessor. If Sublessee fails to perform promptly any of its obligations under this Sublease, Sublessor may perform them without waiving the default. Any expense or liability incurred by Sublessor, including reasonable attorney's fees and costs together with interest at the late payment rate shown in Sublease Supplement No. 1 or the highest lawful interest rate, whichever is less, shall be paid by Sublessee as Supplemental Rent upon demand.

17.    Inspection. U.S. Lessor, Owner Participant, Sublessor, Swedish Lessor, Secured Party or the agents of any of them shall have the right, during reasonable business hours, to enter upon Sublessee's premises, or wherever the Aircraft is located, to inspect the same and any books and records related thereto and to confirm the existence, condition, and proper maintenance of the same and Sublessee's compliance with this Sublease.

18.    Use and Possession; Sublessor Liens. So long as no Default or Event of Default exists and subject to the second paragraph of Section 6, Sublessee may possess and use the Aircraft in accordance with this Sublease without disturbance or hindrance from Sublessor or any party claiming through Sublessor. Throughout the term of this Sublease, Sublessor shall not permit to exist any Sublessor Lien.

19.    Return of Aircraft. (a) On termination of this Sublease, Sublessee shall, at its own expense, return the Aircraft along with all logs, manuals, data and inspection, modification and overhaul records required to be maintained with respect thereto, to such place as Sublessee and Sublessor shall mutually agree within the continental United States of America, in the same condition as received, normal wear and tear excepted, with Sublessee's logos stripped from the Aircraft.

(b)    The Aircraft, when returned, shall be registered in the name of U.S. Lessor with the FAA, shall have a valid Certificate of Airworthiness issued by the FAA, and the Sublessee shall return to the Sublessor all of the Aircraft's maintenance manuals, records, maintenance and flight logs, and other similar recording data.

(c)    Sublessee agrees to return the Aircraft to Sublessor in the following condition and in accordance with the following terms:

(i)    Sublessee shall return the Aircraft, at its own risk and expense, free and clear of all Liens attributable to Sublessee and in the same operating order, repair, condition, configuration (e.g., equipment and seating arrangement) and appearance (e.g., cleanliness) as existed on the Delivery Date, ordinary wear and tear excepted;

(ii)    the Aircraft shall be operational and fully equipped with two engines, two propellers, and other equipment duly installed thereon;

(iii)    the Aircraft and the engines, propellers and parts comprising it shall be in full compliance with, and shall have been maintained as required by, Sections 14 and 15;

(iv)    the Aircraft shall be current with respect to, and be eligible for continuation under, and FAA-approved maintenance program;

20

(v)   the Aircraft shall be in compliance with all applicable (a) mandatory FAA airworthiness directives, notices and modification orders whose last compliance date is on or before the termination of the term of this Sublease and (b) mandatory manufacturer service bulletins and service letters whose last compliance date is on or before the termination of the term of this Sublease;

(vi)   the engines shall be current under Sublessee's ECMP and eligible for inclusion in a successor ECMP without any penalties or costs to Sublessor or the new operator;

(vii)   at Sublessor's written request, all unique nomenclature of Sublessee, including all advertising or insignia or special markings placed thereon by Sublessee, shall have been removed from the exterior of the Aircraft;

(viii)   all aircraft records provided to Sublessee by Sublessor shall be returned, along with all updates thereto as required under the rules and regulations of the FAA; and

(ix)   Sublessee shall pay to Sublessor the Usage Fee identified in the Sublease Rent Schedule.

(d)   Upon return of the Aircraft and all aircraft records, Sublessor shall inform Sublessee of any defects or deficiencies in the Aircraft or Aircraft Records which exceed ordinary wear and tear or which Sublessee is otherwise responsible for correcting pursuant to the terms of this Agreement. Upon Sublessor's reasonable determination that all conditions of return have been satisfied, Sublessor and Sublessee shall execute a return acceptance certificate in the form of Exhibit C whereupon the Aircraft shall be deemed returned.

(e)   Notwithstanding anything to the contrary contained in this Section 19 or elsewhere in this Sublease, in no event shall Sublessee be responsible for complying with any mandatory FAA airworthiness directives, notices or modification orders whose last compliance date is before the Delivery Date or after the termination of the term of this Sublease or with any mandatory manufacturer service bulletins or service letters whose last compliance date is before the Delivery Date or after the termination of the Term of this Sublease.

Prior to return of the Aircraft under this Section, Sublessor shall be entitled to a return delivery flight and inspection to be conducted at Sublessee's expense. During the return delivery flight, a pilot and other personnel appointed by Sublessor or its designee, in conjunction with Sublessee's (or any relevant sublessee's) flight crew, will accomplish a flight to determine the acceptability of the condition of the Aircraft pursuant to the provisions of this Section, including determination of the airworthiness of the Aircraft and proper functioning of all systems and components. Any discrepancy or malfunction not in compliance with the return provisions of this Section, including any discrepancy or malfunction detected of an

airworthiness or operational nature under the FAA-approved maintenance program of Sublessee (or any Sublessee), shall be corrected. All costs associated with such corrections shall be for the account of Sublessee.

20.   [Reserved.]

21.   <u>Mortgage, Assignment and Sublease</u>. Sublessee shall not, and shall have no power to, sell, transfer, assign, charter, sublease, convey, pledge, mortgage, or otherwise encumber its interest in and to this Sublease or the Aircraft or any component thereof, and any such sale, transfer, assignment, charter, sublease, conveyance, delivery, pledge, mortgage, or encumbrance, by operation of law or otherwise, without the prior written consent of Sublessor shall be void.

Notwithstanding the foregoing, so long as no Default or Event of Default exists and so long as the action to be taken does not adversely affect the Liens of the Loan Agreement and the Owner Trustee Security Agreement or Swedish Lessor's, Owner's or Sublessor's interest in the Aircraft, and subject to the use restrictions set forth in Section 14 hereof, any Engine or Propeller may be subjected by Sublessee to a pooling arrangement customary in the airline industry, entered into with any United States domestic commercial airline in the ordinary course of Sublessee's business, <u>provided</u> that if U.S. Lessor's title thereto is divested as a result thereof or if Sublessee relinquishes possession thereof for more than 180 continuous days, such Engine or Propeller shall be deemed to have suffered a Loss and Sublessee shall comply with Section 8 in respect thereof.

22.   <u>Events of Default</u>. The occurrence of any of the following shall, at the option of Sublessor and without any notice other than provided herein, constitute an Event of Default under this Sublease: (a) Sublessee fails to pay any rent or other sums due hereunder and such failure shall continue for ten (10) business days after written notice thereof (except in the case of rent due under Section 5 hereof, in which case no notice shall be required) from Sublessor has been received by Sublessee; (b) Sublessee fails to perform any other covenant herein and such failure continues for thirty (30) days after written notice thereof by Sublessor to Sublessee or, in the event such failure is with respect to Aircraft maintenance or modification and cannot be remedied with diligent effort during such 30-day period, such longer period as may be necessary to remedy such failure, provided there be promptly initiated and uninterruptedly continued the diligent effort of Sublessee to remedy such failure and in any event not to exceed ninety (90) days; (c) Sublessee fails to maintain insurance for the Aircraft; (d) Sublessee files a petition in bankruptcy, or for reorganization, or for an arrangement pursuant to the federal bankruptcy laws, as now constituted or hereafter amended, or any similar federal or state or foreign law, or is adjudicated bankrupt or insolvent, or makes an assignment for the benefit of creditors, or admits in writing its inability to pay its debts generally as they become due, or is dissolved, or takes any corporate action in furtherance of any of the foregoing; (e) a petition or answer proposing the adjudication of Sublessee as a bankrupt, or its reorganization under the federal bankruptcy laws, as now constituted or hereafter amended, or any similar federal or state or foreign law, or seeking the appointment of a receiver, liquidator, assignee, custodian,

trustee, sequestrator (or similar official) of Sublessee or for all or substantially all of its property, or seeking the winding-up or liquidation of its affairs, is filed in any court; and (i) Sublessee shall consent to such filing, or (ii) such petition or answer is not discharged or denied within ninety (90) days after such filing; (f) a receiver, trustee or liquidator (or other similar official) is appointed for or takes possession or charge of Sublessee, substantially all of its assets, or the Aircraft; or (g) any representation by Sublessee contained in this Sublease, or in any certificate required to be delivered hereunder shall have been incorrect in any material respect when made and shall not have been cured within 30 days after receipt by the Sublessee of written notice.

23.   **Remedies of Sublessor**.  Upon the occurrence of any Event of Default and at any time thereafter so long as the same shall be continuing, Sublessor may, at its option, declare by written notice to Sublessee this Sublease to be in default; and at any time thereafter, so long as any such outstanding Event of Default shall not have been remedied, Sublessor may do one or more of the following with respect to all or any part of the Airframe and any or all of the Engines as Sublessor in its sole discretion shall elect, to the extent permitted by, and subject to compliance with any mandatory requirements of, applicable law then in effect:

(a)    upon the written demand of Sublessor and at Sublessee's expense, cause Sublessee to return promptly, and Sublessee shall return promptly, the Aircraft as Sublessor may so demand to Sublessor in the manner and condition required by, and otherwise in accordance with all the provisions of, Section 19 as if the Aircraft were being returned at the end of the term, or Sublessor, at its option, may enter upon the premises where all or any part of the Aircraft is located and take immediate possession of and remove the same by summary proceedings or otherwise (and/or, at Sublessor's option, store the same at Sublessee's premises until disposal thereof by Sublessor), all without liability accruing to Sublessor for or by reason of such entry or taking of possession or removing whether for the restoration or damage of property caused by such action or otherwise;

(b)    whether or not Sublessor shall have exercised, or shall thereafter at any time exercise, any of its rights under paragraph (a) above, Sublessor, by written notice to Sublessee specifying a payment date, may demand that Sublessee pay to Sublessor, and Sublessee shall pay Sublessor, on the payment date so specified, as liquidated damages for loss of a bargain and not as a penalty (in lieu of Rent for the Aircraft due for the then remaining term of this Sublease (without any extension thereof)) an amount equal to the aggregate of all unpaid Rent for the entire term of the Sublease (together with interest, if any, on such amount with interest at the Past Due Rate from such specified payment date until the date of actual payment of such amount); and

(c)    Sublessor may terminate this Sublease as to the Aircraft, and/or may exercise any other right or remedy which may be available to it under applicable law or proceed by appropriate court action to enforce the terms hereof or to recover damages for breach hereof.

In addition, Sublessee shall be liable, except as otherwise provided above without duplication of amounts payable hereunder, for any and all unpaid Rent due hereunder before, after or during the exercise of any of the foregoing remedies and for all reasonable and actual legal fees and other costs and expenses (including fees of the appraisers hereinabove referred to) incurred by Sublessor, in connection with the return of the Aircraft in accordance with the term of Section 19 or in placing the Aircraft in the condition and airworthiness required by such section.

Except as otherwise expressly provided above, no remedy referred to in this Section 23 is intended to be exclusive, but each shall be cumulative and in addition to any other remedy referred to above or otherwise available to Sublessor at law or in equity; and the exercise or beginning of exercise by Sublessor of any one or more of such remedies shall not preclude the simultaneous or later exercise by Sublessor of any or all of such other remedies. No waiver by Sublessor of any Event of Default shall in any way be, or be construed to be, a waiver of any future or subsequent Event of Default.

24. <u>Sublessor's Failure to Exercise Rights</u>. The failure of Sublessor to exercise the rights granted it hereunder upon any occurrence of any of the contingencies set forth herein shall not constitute a waiver or any such right upon the continuation or recurrence of any such contingencies or similar contingencies.

25. <u>Further Assurance</u>. Sublessee shall execute and deliver to Sublessor or Secured Party such instruments and assurances as U.S. Lessor, Owner Participant, Swedish Lessor, Guarantor, Sublessor or Secured Party reasonably deems necessary for the protection and perfection of U.S. Lessor's, Owner Participant's, Swedish Lessor's, Guarantor's, Sublessor's or Secured Party's rights and interests in this Sublease and the Aircraft. Sublessee agrees that it will perform any act and execute, acknowledge, deliver, file, register, record and deposit any instrument requested by U.S. Lessor, Owner Participant, Swedish Lessor, Guarantor, Sublessor or Secured Party for such purposes.

26. <u>Notices</u>. All notices shall be in writing and deemed delivered or received when delivered, when delivery is refused or when the same are returned after failure to be called for, after being sent by hand, by overnight delivery service or by certified or registered mail, return receipt requested, to Sublessor or Sublessee at their respective addresses set forth in Section C of Exhibit B hereto, or at any later address last known to the sender.

27. <u>Severability</u>. If any term or provision hereof or the application thereof to any circumstance shall, in any jurisdiction and to any extent, be invalid or unenforceable, such term or such provision shall be ineffective as to such jurisdiction to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable any remaining terms and provisions hereof or the application of such term or provision to circumstances other than those as to which it is held invalid or unenforceable. To the extent permitted by applicable law, the parties hereto hereby waive any provision of law which renders any term or provision hereof invalid or unenforceable in any respect.

28.    [Reserved.]

29.    <u>Notice of Events Affecting Aircraft</u>. Sublessee shall immediately notify Sublessor at the address shown in Section 25, in writing of any: (i) accident or event which could affect the airworthiness or value of the Aircraft, or which involves the Aircraft in bodily injury or death, (ii) Default or Event of Default, or (iii) attachment, tax Lien, other Lien or other judicial process other than Liens permitted by Section 11 hereof that could attach to the Aircraft.  Such notice shall be received by Sublessor no more than three days after Sublessee first becomes aware of the circumstance.

30.    <u>Applicable Law</u>.  The laws of the State of New York shall govern the construction, interpretation and application of this Sublease.

31.    <u>Federal Bankruptcy Code</u>. To the extent provided by the Federal Bankruptcy Code, or to the fullest extent to which Sublessee may lawfully agree, Sublessee agrees, in accordance with Section 1110 of Title 11 of the United States Code as amended (or any successor or superseding statute), that the interest of Sublessor in the Aircraft, its engines and propellers, and any right of Sublessor, U.S. Lessor, Swedish Lessor, Secured Party and any other party to take possession of the Aircraft, its engines and propellers in compliance with the provisions of this Sublease, shall not be affected by the provisions of Section 362 or 363 of Title 11 of the United States Code or any similar provisions of any succeeding or superseding statue, as amended.

32.    <u>Exhibits and Supplements</u>.   Each Exhibit attached to this Sublease and each Sublease Supplement hereto forms an integral part of this Sublease.

33.    <u>Counterparts</u>.  This Sublease may be executed in any number of counterparts and by the parties hereto on separate counterparts, each of which counterparts shall for all purposes be deemed to be an original; and all such counterparts shall together constitute but one and the same Sublease.


\*                           \*                           \*

IN WITNESS WHEREOF, Sublessor and Sublessee have executed this Sublease by their duly authorized officers, principals or representatives, as the case may be, as of the day and year first written above.

FAIRBROOK LEASING, INC.

By: _____

Gena H. Laurent
Vice President

By: _____

Torbjörn Lindberg
President

MESABA AVIATION, INC.

By: _____

Receipt in New York, NY of an original counterpart of the foregoing Sublease is hereby acknowledged this _____ of _____, 1997.

First Security Bank, National Association,
not in its individual capacity, but solely as
Owner Trustee

By: _____
Its: Authorized Representative

Receipt in New York, NY of an original counterpart of the foregoing Sublease is hereby acknowledged this _____ of _____, 1997.

National Westminster Bank PLC

By: _____
Its: Authorized Representative

IN WITNESS WHEREOF, Sublessor and Sublessee have executed this Sublease by their duly authorized officers, principals or representatives, as the case may be, as of the day and year first written above.

FAIRBROOK LEASING INC.

By:_____
   Gena H. Laurent
   Vice President

By:_____
   Torbjörn Lindberg
   President

MESABA AVIATION, INC.

By: _____
   VICE PRESIDENT

Receipt in New York, NY of an original counterpart of the foregoing Sublease is hereby acknowledged this _____ of _____, 1997.

First Security Bank, National Association, not in its individual capacity, but solely as Owner Trustee

By: _____
Its: Authorized Representative

Receipt in New York, NY of an original counterpart of the foregoing Sublease is hereby acknowledged this _____ of _____, 1997.

National Westminster Bank PLC

By: _____
Its: Authorized Representative

Schedule 1

## SUBLEASE RENT SCHEDULE

\*

B.   Basic Rent:                      $55,000 per month, payable in advance, through the
                                      first year of the Term and $63,000 per month, payable
                                      in advance, thereafter.

C.   Basic Rent
     Payment Dates:                   The first day of each calendar month during the Term
                                      and the last day of the actual Term (with prorated
                                      payments for partial months, if any, on the first and
                                      last Basic Rent Payment Dates).

D.   Stipulated Loss Value:           As set forth in Annex I hereto.

E.   Usage Fee:                       Within ten (10) days after the termination of the
                                      Sublease, Sublessee shall pay to Sublessor the aggre-
                                      gate amount of the "usage fees" computed by
                                      multiplying the unit rate set forth in Annex II hereto
                                      for each component listed thereon by the number of
                                      hours/cycles accrued on such component between the
                                      Delivery Date and the date of return of the Aircraft
                                      pursuant to Section 19 of the Sublease. Sublessor and
                                      Sublessee hereby agree that Sublessee's responsibility
                                      to pay for such components will be limited to payment
                                      of the Usage Fees.

\*Intentionally omitted from FAA filing counterpart as containing confidential financial information.

**MESABA AVIATION, INC.**                                    **ANNEX I**

**SAAB 340B-181**

**STIPULATED LOSS VALUE TABLE**

| SLV PERIOD | SLV DATE | STIPULATED LOSS VALUE |
|---|---|---|
| * | * | * |
| 0 | DELIVERY DATE | $6,944,533.00 |
| 1 | 07/01/97 | $6,909,466.00 |
| 2 | 08/01/97 | $6,874,398.00 |
| 3 | 09/01/97 | $6,838,626.00 |
| 4 | 10/01/97 | $6,802,853.00 |
| 5 | 11/01/97 | $6,767,081.00 |
| 6 | 12/01/97 | $6,730,595.00 |
| 7 | 01/01/98 | $6,694,109.00 |
| 8 | 02/01/98 | $6,657,623.00 |
| 9 | 03/01/98 | $6,620,416.00 |
| 10 | 04/01/98 | $6,583,209.00 |
| 11 | 05/01/98 | $6,546,001.00 |
| 12 | 06/01/98 | $6,508,364.00 |
| 13 | 07/01/98 | $6,470,726.00 |
| 14 | 08/01/98 | $6,433,088.00 |
| 15 | 09/01/98 | $6,394,941.00 |
| 16 | 10/01/98 | $6,356,793.00 |
| 17 | 11/01/98 | $6,318,646.00 |
| 18 | 12/01/98 | $6,279,983.00 |
| 19 | 01/01/99 | $6,241,320.00 |
| 20 | 02/01/99 | $6,202,657.00 |
| 21 | 03/01/99 | $6,163,473.00 |
| 22 | 04/01/99 | $6,124,289.00 |
| 23 | 05/01/99 | $6,085,105.00 |
| 24 | 06/01/99 | $6,045,477.00 |
| 25 | 07/01/99 | $6,005,848.00 |
| 26 | 08/01/99 | $5,966,219.00 |
| 27 | 09/01/99 | $5,926,121.00 |
| 28 | 10/01/99 | $5,886,023.00 |
| 29 | 11/01/99 | $5,845,925.00 |
| 30 | 12/01/99 | $5,805,352.00 |
| 31 | 01/01/00 | $5,764,779.00 |
| 32 | 02/01/00 | $5,724,206.00 |
| 33 | 03/01/00 | $5,683,154.00 |
| 34 | 04/01/00 | $5,642,102.00 |
| 35 | 05/01/00 | $5,601,049.00 |
| 36 | 06/01/00 | $5,599,481.00 |
| 37 | 07/01/00 | $5,517,913.00 |
| 38 | 08/01/00 | $5,476,345.00 |
| 39 | 09/01/00 | $5,434,573.00 |

MESABA AVIATION, INC.                                ANNEX I

SAAB 340B-181

STIPULATED LOSS VALUE TABLE

| 40 | 10/01/00 | $5,392,801.00 |
|----|----------|---------------|
| 41 | 11/01/00 | $5,351,029.00 |
| 42 | 12/01/00 | $5,309,079.00 |
| 43 | 01/01/01 | $5,267,129.00 |
| 44 | 02/01/01 | $5,225,179.00 |
| 45 | 03/01/01 | $5,183,043.00 |
| 46 | 04/01/01 | $5,140,906.00 |
| 47 | 05/01/01 | $5,098,769.00 |
| 48 | 06/01/01 | $5,056,454.00 |
| 49 | 07/01/01 | $5,014,139.00 |
| 50 | 08/01/01 | $4,971,823.00 |
| 51 | 09/01/01 | $4,929,345.00 |
| 52 | 10/01/01 | $4,886,867.00 |
| 53 | 11/01/01 | $4,844,389.00 |
| 54 | 12/01/01 | $4,801,764.00 |
| 55 | 01/01/02 | $4,759,138.00 |
| 56 | 02/01/02 | $4,716,513.00 |
| 57 | 03/01/02 | $4,673,756.00 |
| 58 | 04/01/02 | $4,630,999.00 |
| 59 | 05/01/02 | $4,588,242.00 |
| 60 | 06/01/02 | $4,545,365.00 |
| 61 | 07/01/02 | $4,502,488.00 |
| 62 | 08/01/02 | $4,459,611.00 |
| 63 | 09/01/02 | $4,416,633.00 |
| 64 | 10/01/02 | $4,373,654.00 |
| 65 | 11/01/02 | $4,330,676.00 |
| 66 | 12/01/02 | $4,287,615.00 |
| 67 | 01/01/03 | $4,244,554.00 |
| 68 | 02/01/03 | $4,201,493.00 |
| 69 | 03/01/03 | $4,158,368.00 |
| 70 | 04/01/03 | $4,115,244.00 |
| 71 | 05/01/03 | $4,072,119.00 |
| 72 | 06/01/03 | $4,028,945.00 |

*Intentionally omitted from FAA filing counterpart as containing
confidential financial information.

Annex II

Component Overhaul & Inspection Status

Saab 340B-181

| Item Description | Interval | Units | Cost | Unit Rate | A Delivery Unit Status | B Return Status | C Net Amounts Status B-A | D Owed to/from Lessee C x Unit Rate | Unit installed at aircraft return |
|---|---|---|---|---|---|---|---|---|---|
| **Saab 340B-181** | | | | | | | | | |
| A/C Generator (L) | 2000 | hrs | 1,450.00 | 0.73 | 845.6 | | | | |
| A/C Generator (R) | 2000 | hrs | 1,450.00 | 0.73 | 1,261.8 | | | | |
| Cockpit Voice Recorder | 9000 | hrs | 2,600.00 | 0.29 | 3,122.9 | | | | |
| DC Generator (R) | 1600 | hrs | 1,450.00 | 0.91 | 0.0 | | | | |
| DC Generator (L) | 1600 | hrs | 1,450.00 | 0.91 | 781.6 | | | | |
| Flap Actuator (L) | 58162 | cyc | 2,793.00 | 0.05 | 14,426 | | | | |
| Flap Actuator (R) | 58162 | cyc | 2,793.00 | 0.05 | 14,426 | | | | |
| Hydraulic Pump | 6000 | hrs | 5,032.00 | 0.84 | 2.3 | | | | |
| Engine mount (L) | 5000 | hrs | 2,333.00 | 0.47 | 1,648.3 | | | | |
| Engine mount (R) | 5000 | hrs | 2,333.00 | 0.47 | 174.7 | | | | |
| Engine mount (Lwr) | 5000 | hrs | 3,049.00 | 0.61 | 1,486.0 | | | | |
| Engine mount (L) | 5000 | hrs | 2,333.00 | 0.47 | 1,001.6 | | | | |
| Engine mount (R) | 5000 | hrs | 2,333.00 | 0.47 | 1,001.6 | | | | |
| Engine mount (Lwr) | 5000 | hrs | 3,049.00 | 0.61 | 2,143.2 | | | | |
| Drag Brace (Main L) | 12000 | cyc | 6,000.00 | 0.50 | 0 | | | | |
| Drag Brace (Main R) | 12000 | cyc | 6,000.00 | 0.50 | 0 | | | | |
| Drag Brace (Nose) | 12000 | cyc | 6,000.00 | 0.50 | 0 | | | | |
| Shock Strut (Main L) | 12000 | cyc | 20,000.00 | 1.67 | 0 | | | | |
| Shock Strut (Main R) | 12000 | cyc | 20,000.00 | 1.67 | 0 | | | | |
| Shock Strut (Nose) | 12000 | cyc | 15,000.00 | 1.25 | 0 | | | | |
| Retract Actuator (Main L) | 24000 | cyc | 1,000.00 | 0.04 | 14,426 | | | | |
| Retract Actuator (Main R) | 24000 | cyc | 1,000.00 | 0.04 | 14,426 | | | | |
| Retract Actuator (Nose) | 24000 | cyc | 1,500.00 | 0.06 | 1 | | | | |
| Propeller (Left) | 7500 | hrs | 11,000.00 | 1.47 | 6,920.8 | | | | |
| Propeller (Left) | 7500 | hrs | 3,500.00 | 0.47 | 5,368.7 | | | | |
| Propeller Blade(Left) | 7500 | hrs | 3,500.00 | 0.47 | 5,368.7 | | | | |
| Propeller Blade(Left) | 7500 | hrs | 3,500.00 | 0.47 | 0.0 | | | | |
| Propeller Blade(Left) | 7500 | hrs | 3,500.00 | 0.47 | 5,368.7 | | | | |
| Propeller Blade(Right) | 7500 | hrs | 3,500.00 | 0.47 | 4,165.8 | | | | |
| Propeller (Right) | 7500 | hrs | 11,000.00 | 1.47 | 2,317.5 | | | | |
| Propeller Blade(Right) | 7500 | hrs | 3,500.00 | 0.47 | 0.0 | | | | |
| Propeller Blade(Right) | 7500 | hrs | 3,500.00 | 0.47 | 0.0 | | | | |
| Propeller Blade(Right) | 7500 | hrs | 3,500.00 | 0.47 | 0.0 | | | | |
| Propeller Blade(Right) | 7500 | hrs | 3,500.00 | 0.47 | 0.0 | | | | |
| 72/48 Month Inspection | 1460 | Days | 20,000.00 | 13.70 | 6/30/97 | | | | |
| 30,000 Cycle Inspection | 30000 | cycles | 15,000.00 | 0.50 | 14,426 | | | | |
| 4000 hour Inspection | 4000 | hrs | 100,000.00 | 25.00 | 0.0 | | | | |
| **Subtotal** | | | 135,000.00 | 39.20 | | | | | |

## 340B-181 Component Status

| MRB Task # | Pos | Factor | Interval | Comp Time @ Install | Acft Time When Item Completed | Item Next Due | Description |
|---|---|---|---|---|---|---|---|
| 237001 | | Hrs | 9000 | 2,984.8 | 14,922.2 | 20,937.4 | Overhaul CVR |

| Acft Current Data | | | | | |
|---|---|---|---|---|---|
| Hours: | 15,060.3 | Item TSO: 3,122.9 | Component S/N | Paperwork & Type | Ckd  OK |
| Cycles: | 14,426 | Item CSO: | 57728 | Simmons W.O | |
| Date: | 25 Jun, 97 | | | | |

| MRB Task # | Pos | Factor | Interval | Comp Time @ Install | Acft Time When Item Completed | Item Next Due | Description |
|---|---|---|---|---|---|---|---|
| 242102 | Lt | Hrs | 2000 | 46.6 | 14,261.3 | 16,214.7 | Overhaul Generator |

| Acft Current Data | | | | | |
|---|---|---|---|---|---|
| Hours: | 15,060.3 | Item TSO: 845.6 | Component S/N | Paperwork & Type | Ckd  OK |
| Cycles: | 14,426 | Item CSO: | 95046 | 8130 & DD Trail | |
| Date: | 25 Jun, 97 | | | | |

| MRB Task # | Pos | Factor | Interval | Comp Time @ Install | Acft Time When Item Completed | Item Next Due | Description |
|---|---|---|---|---|---|---|---|
| 242102 | Rt | Hrs | 2000 | 8.4 | 13,806.9 | 15,798.5 | Overhaul Generator |

| Acft Current Data | | | | | |
|---|---|---|---|---|---|
| Hours: | 15,060.3 | Item TSO: 1,261.8 | Component S/N | Paperwork & Type | Ckd  ok |
| Cycles: | 14,426 | Item CSO: | 1315 | Vendor Tag | |
| Date: | 25 Jun, 97 | | | | |

| MRB Task # | Pos | Factor | Interval | Comp Time @ Install | Acft Time When Item Completed | Item Next Due | Description |
|---|---|---|---|---|---|---|---|
| 243103 | Lt | Hrs | 1600 | 0.0 | 15,060.3 | 16,660.3 | Overhaul Generator - Not Required if 243104 Performed |

| Acft Current Data | | | | | |
|---|---|---|---|---|---|
| Hours: | 15,060.3 | Item TSO: 0.0 | Component S/N | Paperwork & Type | Ckd  ok |
| Cycles: | 14,426 | Item CSO: | 4263 | FFV W.O FFV INstall | |
| Date: | 25 Jun, 97 | | | | |

| MRB Task # | Pos | Factor | Interval | Comp Time @ Install | Acft Time When Item Completed | Item Next Due | Description |
|---|---|---|---|---|---|---|---|
| 243103 | Rt | Hrs | 1600 | 757.0 | 15,035.7 | 15,878.7 | Overhaul Generator - Not Required if 243104 Performed |

| Acft Current Data | | | | | |
|---|---|---|---|---|---|
| Hours: | 15,060.3 | Item TSO: 781.6 | Component S/N | Paperwork & Type | Ckd  OK |
| Cycles: | 14,426 | Item CSO: | 96069 | DD FROM 390 | |
| Date: | 25 Jun, 97 | | | | |

| MRB Task # | Pos | Factor | Interval | Comp Time @ Install | Acft Time When Item Completed | Item Next Due | Description |
|---|---|---|---|---|---|---|---|
| 275110 | Lt | Cys | 58162 | 0 | 0 | 58,162 | Replace flap actuator P/N TP 1000-10 |

| Acft Current Data | | | | | |
|---|---|---|---|---|---|
| Hours: | 15,060.3 | Item TSO: | Component S/N | Paperwork & Type | Ckd  OK |
| Cycles: | 14,426 | Item CSO: 14,426 | 439 | DD | |
| Date: | 25 Jun, 97 | | | | |

| MRB Task # | Pos | Factor | Interval | Comp Time @ Install | Acft Time When Item Completed | Item Next Due | Description |
|---|---|---|---|---|---|---|---|
| 275110 | Rt | Cys | 58162 | 0 | 0 | 58,162 | Replace flap actuator P/N TP 1000-10 |

| Acft Current Data | | | | | |
|---|---|---|---|---|---|
| Hours: | 15,060.3 | Item TSO: | Component S/N | Paperwork & Type | Ckd  OK |
| Cycles: | 14,426 | Item CSO: 14,426 | 440 | DD | |
| Date: | 25 Jun, 97 | | | | |

| MRB Task # | Pos | Factor | Interval | Comp Time @ Install | Acft Time When Item Completed | Item Next Due | Description |
|---|---|---|---|---|---|---|---|
| 291008 | | Hrs | 6000 | 0.0 | 15,058.0 | 21,058.0 | Repl motor pump bearings (Without prop brake use) |

| Acft Current Data | | | | | |
|---|---|---|---|---|---|
| Hours: | 15,060.3 | Item TSO: 2.3 | Component S/N | Paperwork & Type | Ckd  OK |
| Cycles: | 14,426 | Item CSO: | AH93404 | Vendor Tag | |
| Date: | 25 Jun, 97 | | | | |

### 340B-181 Component Status

| MRB Task # | Pos | Factor | Interval | Comp Time @ Install | Acft Time When Item Completed | Item Next Due | Description |
|---|---|---|---|---|---|---|---|
| 321109 | Lt | Cys | 12000 | 0 | 14,426 | 26,426 | M.L.G. Shock Strut Overhaul |

Acft Current Data — Hours: 15,060.3 — Cycles: 14,426 — Date: 25 Jun, 97
Item TSO: — Item CSO: 0 — Component S/N LK8905845 — Paperwork & Type FFV W.O FFV Install — Ckd ok

| MRB Task # | Pos | Factor | Interval | Comp Time @ Install | Acft Time When Item Completed | Item Next Due | Description |
|---|---|---|---|---|---|---|---|
| 321109 | Lt | Cys | 12000 | 0 | 14,426 | 26,426 | M.L.G. Drag Brace Overhaul |

Acft Current Data — Hours: 15,060.3 — Cycles: 14,426 — Date: 25 Jun, 97
Item TSO: — Item CSO: 0 — Component S/N LK8907009 — Paperwork & Type FFV W.O FFV Install — Ckd ok

| MRB Task # | Pos | Factor | Interval | Comp Time @ Install | Acft Time When Item Completed | Item Next Due | Description |
|---|---|---|---|---|---|---|---|
| 321109 | Rt | Cys | 12000 | 0 | 14,426 | 26,426 | M.L.G. Shock Strut Overhaul |

Acft Current Data — Hours: 15,060.3 — Cycles: 14,426 — Date: 25 Jun, 97
Item TSO: — Item CSO: 0 — Component S/N LK8905840 — Paperwork & Type FFV W.O FFV Install — Ckd ok

| MRB Task # | Pos | Factor | Interval | Comp Time @ Install | Acft Time When Item Completed | Item Next Due | Description |
|---|---|---|---|---|---|---|---|
| 321109 | Rt | Cys | 12000 | 0 | 14,426 | 26,426 | M.L.G. Drag Brace Overhaul |

Acft Current Data — Hours: 15,060.3 — Cycles: 14,426 — Date: 25 Jun, 97
Item TSO: — Item CSO: 0 — Component S/N LK8905824 — Paperwork & Type FFV W.O FFV Install — Ckd ok

| MRB Task # | Pos | Factor | Interval | Comp Time @ Install | Acft Time When Item Completed | Item Next Due | Description |
|---|---|---|---|---|---|---|---|
| 322109 | | Cys | 12000 | 0 | 14,426 | 26,426 | N.L.G. Shock Strut Overhaul |

Acft Current Data — Hours: 15,060.3 — Cycles: 14,426 — Date: 25 Jun, 97
Item TSO: — Item CSO: 0 — Component S/N LK8902335 — Paperwork & Type FFV W.O — Ckd ok

| MRB Task # | Pos | Factor | Interval | Comp Time @ Install | Acft Time When Item Completed | Item Next Due | Description |
|---|---|---|---|---|---|---|---|
| 322109 | | Cys | 12000 | 0 | 14,426 | 26,426 | N.L.G. Drag Brace Overhaul |

Acft Current Data — Hours: 15,060.3 — Cycles: 14,426 — Date: 25 Jun, 97
Item TSO: — Item CSO: 0 — Component S/N LK8905350 — Paperwork & Type FFV W.O — Ckd ok

| MRB Task # | Pos | Factor | Interval | Comp Time @ Install | Acft Time When Item Completed | Item Next Due | Description |
|---|---|---|---|---|---|---|---|
| 323110 | Lt | Cys | 24000 | 0 | 0 | 24,000 | Landing Gear Retract Actuator Overhaul |

Acft Current Data — Hours: 15,060.3 — Cycles: 14,426 — Date: 25 Jun, 97
Item TSO: — Item CSO: 14,426 — Component S/N LK8904837 — Paperwork & Type DD — Ckd OK

| MRB Task # | Pos | Factor | Interval | Comp Time @ Install | Acft Time When Item Completed | Item Next Due | Description |
|---|---|---|---|---|---|---|---|
| 323110 | N | Cys | 24000 | 0 | 14,425 | 38,425 | Landing Gear Retract Actuator Overhaul |

Acft Current Data — Hours: 15,060.3 — Cycles: 14,426 — Date: 25 Jun, 97
Item TSO: — Item CSO: 1 — Component S/N LK8507891 — Paperwork & Type Vendor Tag — Ckd OK

## 340B-181 Component Status

| MRB Task # | Pos | Factor | Interval | Comp Time @ Install | Acft Time When Item Completed | Item Next Due | Description |
|---|---|---|---|---|---|---|---|
| 323110 | Rt | Cys | 24000 | 0 | 0 | 24,000 | Landing Gear Retract Actuator Overhaul |

| Acft Current Data | | Item TSO: | Component S/N | Paperwork & Type | Ckd | OK |
|---|---|---|---|---|---|---|
| Hours: | 15,060.3 | | | | | |
| Cycles: | 14,426 | Item TSO: | LK8909134   DD | Paperwork & Type | Ckd | OK |
| Date: | 25 Jun, 97 | Item CSO: 14,426 | | | | |

| 611005 | Lt | Hrs | 7500 | 4,918.5 | 13,058.2 | 15,639.7 | Overhaul Prop (Dowty) |
|---|---|---|---|---|---|---|---|
| | | | 5 Yrs | | 28 Jan, 93 | 27 Jan, 98 | |

| Acft Current Data | | | | |
|---|---|---|---|---|
| Hours: | 15,060.3 | | | |
| Cycles: | 14,426 | Item TSO: 6,920.6 | Component S/N DRG/9279/89 | Paperwork & Type Prop Log Book |
| Date: | 25 Jun, 97 | Item CSO: | | Ckd OK |

| 611005 | Lt | Hrs | 7500 | 4,918.7 | 13,058.2 | 15,639.5 | Overhaul Propeller Hub (Dowty) |
|---|---|---|---|---|---|---|---|
| | | | 5 Yrs | | 28 Jan, 93 | 27 Jan, 98 | |

| Acft Current Data | | | | |
|---|---|---|---|---|
| Hours: | 15,060.3 | | | |
| Cycles: | 14,426 | Item TSO: 6,920.8 | Component S/N CW1158 | Paperwork & Type Prop Log Book & Hub Card |
| Date: | 25 Jun, 97 | Item CSO: | | Ckd ok |

| 611005 | Lt - 1 | Hrs | 7500 | 3,366.6 | 13,058.2 | 17,191.6 | Overhaul Propeller Blade (Dowty) |
|---|---|---|---|---|---|---|---|
| | | | 5 Yrs | | 24 Sep, 93 | 23 Sep, 98 | |

| Acft Current Data | | | | |
|---|---|---|---|---|
| Hours: | 15,060.3 | | | |
| Cycles: | 14,426 | Item TSO: 5,368.7 | Component S/N 132B-280 | Paperwork & Type Prop Log Book & Blade Card |
| Date: | 25 Jun, 97 | Item CSO: | | Ckd ok |

| 611005 | Lt - 2 | Hrs | 7500 | 0.0 | 15,060.3 | 22,560.3 | Overhaul Propeller Blade (Dowty) |
|---|---|---|---|---|---|---|---|
| | | | 5 Yrs | | 15 May, 96 | 14 May, 01 | |

| Acft Current Data | | | | |
|---|---|---|---|---|
| Hours: | 15,060.3 | | | |
| Cycles: | 14,426 | Item TSO: 0.0 | Component S/N 132B-1340 | Paperwork & Type Prop Log Book Prop Blade Card |
| Date: | 25 Jun, 97 | Item CSO: | | Ckd ok |

| 611005 | Lt - 3 | Hrs | 7500 | 3,366.6 | 13,058.2 | 17,191.6 | Overhaul Propeller Blade (Dowty) |
|---|---|---|---|---|---|---|---|
| | | | 5 Yrs | | 24 Sep, 93 | 23 Sep, 98 | |

| Acft Current Data | | | | |
|---|---|---|---|---|
| Hours: | 15,060.3 | | | |
| Cycles: | 14,426 | Item TSO: 5,368.7 | Component S/N 132B-285 | Paperwork & Type Prop Log Book & Blade Card |
| Date: | 25 Jun, 97 | Item CSO: | | Ckd ok |

| 611005 | Lt - 4 | Hrs | 7500 | 4,165.8 | 15,060.3 | 18,394.5 | Overhaul Propeller Blade (Dowty) |
|---|---|---|---|---|---|---|---|
| | | | 5 Yrs | | 24 Sep, 93 | 23 Sep, 98 | |

| Acft Current Data | | | | |
|---|---|---|---|---|
| Hours: | 15,060.3 | | | |
| Cycles: | 14,426 | Item TSO: 4,165.8 | Component S/N 132B-275 | Paperwork & Type Prop Log Book & Blade Card |
| Date: | 25 Jun, 97 | Item CSO: | | Ckd ok |

| 611005 | Rt | Hrs | 7500 | 2,004.3 | 14,747.1 | 20,242.8 | Overhaul Prop (Dowty) |
|---|---|---|---|---|---|---|---|
| | | | 5 Yrs | | 4 Sep, 92 | 3 Sep, 97 | |

| Acft Current Data | | | | |
|---|---|---|---|---|
| Hours: | 15,060.3 | | | |
| Cycles: | 14,426 | Item TSO: 2,317.5 | Component S/N DRG/9278/89 | Paperwork & Type Prop Log Book / Time reflects TSO of Hub |
| Date: | 25 Jun, 97 | Item CSO: | | Ckd ok |

## 340B-181 Component Status

| MRB Task # | Pos | Factor | Interval | Comp Time @ Install | Acft Time When Item Completed | Item Next Due | Description |
|---|---|---|---|---|---|---|---|
| 611005 | Rt | Hrs | 7500 | 2,004.3 | 14,747.1 4 Sep, 92 | 20,242.8 3 Sep, 97 | Overhaul Propeller Hub (Dowty) |

| Acft Current Data | | | 5 Yrs | | | | |
|---|---|---|---|---|---|---|---|
| Hours: | 15,060.3 | | | | Component S/N | Paperwork & Type | Ckd  ok |
| Cycles: | 14,426 | | Item TSO: 2,317.5 | | CW1402 | Prop Log Book & Hub Card | |
| Date: | 25 Jun, 97 | | Item CSO: | | | | |

| MRB Task # | Pos | Factor | Interval | Comp Time @ Install | Acft Time When Item Completed | Item Next Due | Description |
|---|---|---|---|---|---|---|---|
| 611005 | Rt - 1 | Hrs | 7500 | 0.0 | 15,060.3 20 May, 97 | 22,560.3 19 May, 02 | Overhaul Propeller Blade (Dowty) |

| Acft Current Data | | | 5 Yrs | | | | |
|---|---|---|---|---|---|---|---|
| Hours: | 15,060.3 | | | | Component S/N | Paperwork & Type | Ckd  ok |
| Cycles: | 14,426 | | Item TSO: 0.0 | | 132B-306 | Prop Log Book & Blade Card | |
| Date: | 25 Jun, 97 | | Item CSO: | | | | |

| MRB Task # | Pos | Factor | Interval | Comp Time @ Install | Acft Time When Item Completed | Item Next Due | Description |
|---|---|---|---|---|---|---|---|
| 611005 | Rt - 2 | Hrs | 7500 | 0.0 | 15,060.3 20 May, 97 | 22,560.3 19 May, 02 | Overhaul Propeller Blade (Dowty) |

| Acft Current Data | | | 5 Yrs | | | | |
|---|---|---|---|---|---|---|---|
| Hours: | 15,060.3 | | | | Component S/N | Paperwork & Type | Ckd  ok |
| Cycles: | 14,426 | | Item TSO: 0.0 | | 132B-91 | Prop Log Book & Blade Card | |
| Date: | 25 Jun, 97 | | Item CSO: | | | | |

| MRB Task # | Pos | Factor | Interval | Comp Time @ Install | Acft Time When Item Completed | Item Next Due | Description |
|---|---|---|---|---|---|---|---|
| 611005 | Rt - 3 | Hrs | 7500 | 0.0 | 15,060.3 20 May, 97 | 22,560.3 19 May, 02 | Overhaul Propeller Blade (Dowty) |

| Acft Current Data | | | 5 Yrs | | | | |
|---|---|---|---|---|---|---|---|
| Hours: | 15,060.3 | | | | Component S/N | Paperwork & Type | Ckd  ok |
| Cycles: | 14,426 | | Item TSO: 0.0 | | 132B-304 | Prop Log Book & Blade Card | |
| Date: | 25 Jun, 97 | | Item CSO: | | | | |

| MRB Task # | Pos | Factor | Interval | Comp Time @ Install | Acft Time When Item Completed | Item Next Due | Description |
|---|---|---|---|---|---|---|---|
| 611005 | Rt - 4 | Hrs | 7500 | 0.0 | 15,060.3 20 May, 97 | 22,560.3 19 May, 02 | Overhaul Propeller Blade (Dowty) |

| Acft Current Data | | | 5 Yrs | | | | |
|---|---|---|---|---|---|---|---|
| Hours: | 15,060.3 | | | | Component S/N | Paperwork & Type | Ckd  ok |
| Cycles: | 14,426 | | Item TSO: 0.0 | | 132B-92 | Prop Log Book & Blade Card | |
| Date: | 25 Jun, 97 | | Item CSO: | | | | |

| MRB Task # | Pos | Factor | Interval | Comp Time @ Install | Acft Time When Item Completed | Item Next Due | Description |
|---|---|---|---|---|---|---|---|
| 712003 | #1Lt | Hrs | 5000 | 1,473.6 | 14,885.6 | 18,412.0 | PGC mount overhaul |

| Acft Current Data | | | | | | | |
|---|---|---|---|---|---|---|---|
| Hours: | 15,060.3 | | | | Component S/N | Paperwork & Type | Ckd  OK |
| Cycles: | 14,426 | | Item TSO: 1,648.3 | | 021 | Simmons W.O | |
| Date: | 25 Jun, 97 | | Item CSO: | | | | |

| MRB Task # | Pos | Factor | Interval | Comp Time @ Install | Acft Time When Item Completed | Item Next Due | Description |
|---|---|---|---|---|---|---|---|
| 712003 | #1Lwr | Hrs | 5000 | 1,311.3 | 14,885.6 | 18,574.3 | PGC mount overhaul |

| Acft Current Data | | | | | | | |
|---|---|---|---|---|---|---|---|
| Hours: | 15,060.3 | | | | Component S/N | Paperwork & Type | Ckd  OK |
| Cycles: | 14,426 | | Item TSO: 1,486.0 | | 0643 | DD TRAIL | |
| Date: | 25 Jun, 97 | | Item CSO: | | | | |

| MRB Task # | Pos | Factor | Interval | Comp Time @ Install | Acft Time When Item Completed | Item Next Due | Description |
|---|---|---|---|---|---|---|---|
| 712003 | #1Rt | Hrs | 5000 | 0.0 | 14,885.6 | 19,885.6 | PGC mount overhaul |

| Acft Current Data | | | | | | | |
|---|---|---|---|---|---|---|---|
| Hours: | 15,060.3 | | | | Component S/N | Paperwork & Type | Ckd  OK |
| Cycles: | 14,426 | | Item TSO: 174.7 | | 0259 | Simmons W.O | |
| Date: | 25 Jun, 97 | | Item CSO: | | | | |

## 340B-181 Component Status

| MRB Task # | Pos | Factor | Interval | Comp Time @ Install | Acft Time When Item Completed | Item Next Due | Description |
|---|---|---|---|---|---|---|---|
| 712003 | #2Lt | Hrs | 5000 | 0.0 | 14,058.7 | 19,058.7 | PGC mount overhaul |

| Acft Current Data | | Item TSO: 1,001.6 | Component S/N | Paperwork & Type | Ckd | OK |
|---|---|---|---|---|---|---|
| Hours: | 15,060.3 | | 674 | Simmons W.O | | |
| Cycles: | 14,426 | Item CSO: | | | | |
| Date: | 25 Jun, 97 | | | | | |

| MRB Task # | Pos | Factor | Interval | Comp Time @ Install | Acft Time When Item Completed | Item Next Due | Description |
|---|---|---|---|---|---|---|---|
| 712003 | #2Lwr | Hrs | 5000 | 1,141.6 | 14,058.7 | 17,917.1 | PGC mount overhaul |

| Acft Current Data | | Item TSO: 2,143.2 | Component S/N | Paperwork & Type | Ckd | OK |
|---|---|---|---|---|---|---|
| Hours: | 15,060.3 | | 156 | Simmons W.O | | |
| Cycles: | 14,426 | Item CSO: | | | | |
| Date: | 25 Jun, 97 | | | | | |

| MRB Task # | Pos | Factor | Interval | Comp Time @ Install | Acft Time When Item Completed | Item Next Due | Description |
|---|---|---|---|---|---|---|---|
| 712003 | #2Rt | Hrs | 5000 | 0.0 | 14,058.7 | 19,058.7 | PGC mount overhaul |

| Acft Current Data | | Item TSO: 1,001.6 | Component S/N | Paperwork & Type | Ckd | OK |
|---|---|---|---|---|---|---|
| Hours: | 15,060.3 | | 0518 | Simmons W.O | | |
| Cycles: | 14,426 | Item CSO: | | | | |
| Date: | 25 Jun, 97 | | | | | |

6y/4y Comp. - 6-30-97
4000 hr Comp - 15,060.3
3KK Due @ 30K

Printed: 2/27/98

Component Overhaul & Inspection Status

Annex II

| Saab 340B Aircraft | | | | Saab 340B | | A Delivery Unit Status | B Return Status | C Net Amounts B-A Status | D Owed to/from Lessee C x Unit Rate | Unit Installed at aircraft return |
|---|---|---|---|---|---|---|---|---|---|---|
| Item Description | Interval | Units | Cost | Unit Rate | | | | | | |
| A/C Generator (L) | 2000 | hrs | 1,450.00 | 0.73 | | | | | | |
| A/C Generator (R) | 2000 | hrs | 1,450.00 | 0.73 | | | | | | |
| Cockpit Voice Recorder | 9000 | hrs | 2,600.00 | 0.29 | | | | | | |
| DC Generator (L) | 1600 | hrs | 1,450.00 | 0.91 | | | | | | |
| DC Generator (R) | 1600 | hrs | 1,450.00 | 0.91 | | | | | | |
| Flap Actuator (L) | 39600 | cyc | 2,793.00 | 0.07 | | | | | | |
| Flap Actuator (R) | 39600 | cyc | 2,793.00 | 0.07 | | | | | | |
| Hydraulic Pump | 6000 | hrs | 5,032.00 | 0.84 | | | | | | |
| Engine mount (L) | 5000 | hrs | 2,333.00 | 0.47 | | | | | | |
| Engine mount (R) | 5000 | hrs | 2,333.00 | 0.47 | | | | | | |
| Engine mount (Lwr) | 5000 | hrs | 3,049.00 | 0.61 | | | | | | |
| Drag Brace (Main L) | 12000 | cyc | 6,000.00 | 0.5 | | | | | | |
| Drag Brace (Main R) | 12000 | cyc | 6,000.00 | 0.5 | | | | | | |
| Drag Brace (Nose) | 12000 | cyc | 6,000.00 | 0.5 | | | | | | |
| Shock Strut (Main L) | 12000 | cyc | 20,000.00 | 1.67 | | | | | | |
| Shock Strut (Main R) | 12000 | cyc | 20,000.00 | 1.67 | | | | | | |
| Shock Strut (Nose) | 12000 | cyc | 15,000.00 | 1.25 | | | | | | |
| Retract Actuator (Main L) | 24000 | cyc | 1,000.00 | 0.04 | | | | | | |
| Retract Actuator (Main R) | 24000 | cyc | 1,000.00 | 0.04 | | | | | | |
| Retract Actuator (Nose) | 24000 | cyc | 1,500.00 | 0.06 | | | | | | |
| Propeller (Left) | 7500 | hrs | 25,000.00 | 3.33 | | | | | | |
| Propeller (Right) | 7500 | hrs | 25,000.00 | 3.33 | | | | | | |
| Subtotal | | | 153,233.00 | 18.99 | | | | | | |
| 72 Month Inspection | 72 | mos | 20,000.00 | 1.39 | | | | | | |
| 30,000 Cycle Inspection | 30000 | cycles | 15,000.00 | 0.50 | | | | | | |
| 4000 hour Inspection | 4000 | hrs | 100,000.00 | 30.00 | | | | | | |
| Subtotal | | | 135,000.00 | 31.89 | | | | | | |

t:\operator\meesaba\annexII.wk4

<u>EXHIBIT A</u>

TO THE EXTENT, IF ANY THAT THIS SUBLEASE SUPPLEMENT NO. 1 CONSTITUTES CHATTEL PAPER (AS SUCH TERM IS DEFINED IN THE UNIFORM COMMERCIAL CODE AS IN EFFECT IN ANY APPLICABLE UNITED STATES JURISDICTION), NO SECURITY INTEREST IN THIS SUBLEASE SUPPLEMENT NO. 1 MAY BE CREATED THROUGH THE TRANSFER OR POSSESSION OF ANY COUNTERPART OTHER THAN THE ORIGINAL EXECUTED COUNTERPART CONTAINING THE RECEIPT THEREFOR EXECUTED BY NATIONAL WESTMINSTER BANK PLC AS SECURED PARTY ON THE SIGNATURE PAGE HEREOF.

<u>SUBLEASE SUPPLEMENT</u>

Sublease Supplement No. 1, dated June ___, 1997 to Aircraft Sublease Agreement dated as of June 1, 1997 (the "Sublease") between Fairbrook Leasing, Inc. ("Sublessor"), and Mesaba Aviation, Inc. ("Sublessee").

I N T R O D U C T I O N

Sublessor and Sublessee have heretofore entered into that certain Aircraft Sublease Agreement dated as of June 1, 1997 relating to the Aircraft, Engines and Propellers more specifically identified below (the "Sublease"; defined terms therein being herein used with the same meanings). The Sublease provides for the execution and delivery of a Sublease Supplement for the purpose of subleasing the Aircraft under the Sublease as and when delivered by Sublessor to Sublessee in accordance with the terms thereof.

[A counterpart of the Sublease, with this Sublease Supplement No. 1 attached thereto, is being filed for recordation with the Federal Aviation Administration as one document.] *

[The Sublease relates to the Airframe, the Engines and the Propellers described below, and a counterpart of the Sublease, with Sublease Supplement No. 1 thereto dated _____, 1997 attached thereto, was recorded by the Federal Aviation Administration on _____ , 1997, as one document and assigned Conveyance No. _____.] **

NOW, THEREFORE, in consideration of the premises and other good and sufficient consideration, Sublessor and Sublessee hereby agree as follows:

1

A.    The Aircraft. Sublessee hereby confirms to Sublessor that Sublessee has accepted the Aircraft described below for all purposes hereof and of the Sublease:

| AIRFRAME<br><br>Manufacturer | U.S. Registration Number | Model | Serial Number |
|---|---|---|---|
| Saab Aircraft | N590MA | 340B | 340B-181 |

| INSTALLED ENGINES<br><br>Manufacturer | Model | Serial Number |
|---|---|---|
| General Electric | CT7-9B | GE-E-785181 |
| General Electric | CT7-9B | GE-E-785121 |

| INSTALLED PROPELLERS<br><br>Manufacturer | Model | Serial Number |
|---|---|---|
| Dowty Rotol | R390/4-123-F/27 | DRG/9279/89 |
| Dowty Rotol | R390/4-123-F/27 | DRG/9278/89 |

---

\*      *This language for Sublease Supplement No. 1.*

\*\*    *This language for Sublease Supplement other than Sublease Supplement No. 1.*

Each of the above-referenced General Electric CT7-9B Engines has 750 or more rated takeoff horsepower or the equivalent of such horsepower.

Each of the above-referenced Dowty Rotol propellers is capable of absorbing 750 or more rated takeoff shaft horsepower.

2

B.  **Delivery Date:**          June ___, 1997.

C.  **Basic Term:**            The period beginning on the Delivery Date and ending on June ___, 2003.

D.  **Late Payment Rate:**     The rate of the published base rate for the relevant period then in effect at Citibank, N.A., in New York, New York

E.  **Counterparts:**          This Sublease Supplement may be executed in any number of counterparts and by the parties hereto on separate counterparts, each of which counterparts, shall for all purposes be deemed to be an original; and all such counterparts shall together constitute but one and the same Sublease Supplement.

IN WITNESS WHEREOF, the parties hereto have executed this Sublease Supplement Number ___ by their duly authorized officers as of the day and year first above written.

FAIRBROOK LEASING INC.

By:_____
   Name:
   Title:


By:_____
   Name:
   Title:


MESABA AVIATION, INC.


By:_____
   Name:
   Title:

Receipt in New York, NY of an original counterpart of the foregoing Sublease Supplement is hereby acknowledged this _____ of _____, 1997.

First Security Bank, National Association,
not in its individual capacity, but solely as
Owner Trustee

By: _____
Its: Authorized Representative

Receipt in New York, NY of an original counterpart of the foregoing Sublease Supplement is hereby acknowledged this _____ of _____, 1997.

National Westminster Bank PLC

By: _____
Its: Authorized Representative

4