## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

**FAIRBROOK LEASING, INC.,**
**a Delaware Corporation;**
**LAMBERT LEASING, INC.,**
**a Delaware Corporation; and**
**SWEDISH AIRCRAFT**
**HOLDINGS AB, a Swedish**
**Corporation,**

|  |  |
|---|---|
| **Plaintiffs,** | **MEMORANDUM AND ORDER** |
| **v.** | **Civil No. 04-3791 (MJD/FLN)** |

**MESABA AVIATION, INC.,**
**a Minnesota Corporation,**

                    **Defendant.**

---

Brooks F. Poley, David M. Aafedt, & Thomas H. Boyd, Winthrop & Weinstine, PA on behalf of Plaintiffs.

Andrew M. Luger and William J. Otteson, Greene Espel, and Jeffrey A. Eyres, Leonard Street & Deinard on behalf of Defendant.

---

## I.    INTRODUCTION

This matter is before the Court on the Parties' cross motions for summary judgment. [Doc. Nos. 19 & 26.] Defendant seeks an order dismissing Counts I through IV of the Complaint, and Plaintiffs seek an order granting them summary judgment on Counts I and II. Oral argument was heard on September 9, 2005.

1

On October 13, 2005, while this matter was under advisement, Defendant Mesaba Aviation ("Mesaba") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. As a result, this case was automatically stayed. On June 16, 2006, the Honorable Gregory F. Kishel, Chief Judge of the United States Bankruptcy Court for the District of Minnesota, approved the Parties' stipulation and lifted the stay for the limited purpose of allowing this Court to rule on the cross motions for summary judgment that were under advisement when the bankruptcy petition was filed. The Court now issues the following order.

## II.   BACKGROUND

Plaintiffs are three affiliates of the Swedish aircraft manufacturer Saab Aircraft AB. The instant case arises out of a March 1996 "Term Sheet Proposal" entered into between Plaintiff Fairbrook Leasing ("FLI") and Defendant Mesaba. The following facts are taken from the Eighth Circuit's opinion in the underlying case ("Saab I").

> Mesaba is a regional airline that operates aircraft for the benefit of Northwest Airlines. . . . On March 7, 1996, Mesaba and [FLI] executed a document entitled "Term Sheet Proposal for the Acquisition of Saab 340 Aircraft by Mesaba Aviation, Inc.," which described the sale of new and the lease of used aircraft. . . .
>
> The Term Sheet contemplates individual long-term subleases for each aircraft, advance payments expected upon the delivery of the 340A aircraft, the length of the subleases, the basic monthly rent per aircraft, the delivery schedule of the aircraft, and Mesaba's right to assign certain rights to Northwest in the event the code-sharing agreement was not renewed before March 31, 1997. . . . A subsection entitled "Effect of this Term Sheet" provides:

> By signing this Term Sheet, SAAI, FLI and Mesaba
> evidence their agreement to negotiate, execute, and
> deliver definitive documentation in substantially the form
> and substance of the 2/18/96 drafts of the above-listed
> documents no later than April 15, 1996; provided,
> however, that in the event of any conflict between the
> terms set forth in this Term Sheet and any such draft, the
> terms set forth in this Term Sheet shall prevail.

(Term Sheet at 10.)

.    .    .

The parties agree that all conditions precedent to effectuating the
Term Sheet were fulfilled. The parties also agreed to modify the Term
Sheet once Northwest became involved in the negotiations. [FLI]
agreed to provide a $13,000 monthly rent rebate from the Term
Sheet's specified $44,000 rent per aircraft.

In May 1996, while negotiations on final documents continued,[1]
Mesaba began accepting delivery of 340A aircraft. Departing from the
Term Sheet, the parties executed short-term subleases ranging from
two to three months for each aircraft, instead of the long-term sublease
of 72 to 96 months. After further negotiations, the parties concluded
only one long-term aircraft lease calling for a term of 96 months.
Notwithstanding the parties' failure to complete a finalized agreement,
[FLI] continued to deliver, and Mesaba continued to accept, planes
under short-term leases, which were extended by agreement several
times. Negotiations for long-term leases for the 340A aircraft
ultimately ceased in December 1998.

.    .    .

In December of 1997, Saab announced it would discontinue its
manufacture of the 340 model commercial aircraft. Despite concerns
that the cost of maintenance might increase as a result, Mesaba
continued to accept delivery of Saab 340A aircraft. Mesaba continued

---

[1] Although the Term Sheet stipulated an April 15, 1996 deadline for the finalization
of their agreement, this date was extended three times. By August 1996, the parties
had not finalized negotiations. They continued to negotiate for two more years.

to operate its twenty-three Saab 340A aircraft through 2001, and paid $31,000 per aircraft per month.

In 2001, Mesaba informed FLI that it was going to return some of the leased aircraft. FLI protested that according to the Term Sheet, the aircrafts' lease duration had not expired. Mesaba argued it was bound only by the short-term leases, and once those expired, it could return the aircraft at any time. In October 2002, Mesaba ceased making lease payments for several of the Saab 340A aircraft.

Fairbrook Leasing, Inc. v. Mesaba Aviation, 408 F.3d 460, 463-64 (8th Cir. 2005) (footnote in original) ("Saab I").

Consequently, FLI filed a declaratory judgment action seeking a judicial declaration regarding the lease termination dates. In December 2003, Chief Judge Rosenbaum granted partial summary judgment for FLI. Fairbrook Leasing, Inc. v. Mesaba Aviation, Inc., 295 F. Supp. 2d 1063, 1076-77 (D. Minn. 2003). Judge Rosenbaum explained that under New York law, two types of preliminary agreements can be binding. Type I agreements are agreements in which the parties agree on "'all the points that require negotiation' and is preliminary only as to form. [Under this type of agreement,] [t]he parties have the right to demand performance of the transaction." Id. at 1069 (quotation omitted). Type II agreements only establish a "framework for agreement, and bind[] the parties to negotiate in good faith within that framework. The parties are free to walk away once they have 'made a good faith effort to close the deal.'" Id. (quotation omitted). Judge Rosenbaum found that the Term Sheet was a Type I agreement, and further

4

concluded that "[e]ven assuming there is no Type I agreement, the Term Sheet satisfies the requirements of a Type II agreement." Id. at 1073-74.

Judge Rosenbaum further found that the short term leases did not extinguish the Term Sheet and that the evidence demonstrated that the Parties intended for the Term Sheet to control until permanent long-term leases were executed. Id. at 1075. Judge Rosenbaum also found that the Term Sheet expressly granted FLI the authority to determine the duration of the leases within a range of 72 to 96 months, subject to any applicable head leases. Id. at 1076.

After Judge Rosenbaum's summary judgment rulings, the Parties entered into a settlement agreement in the declaratory judgment case, and the court entered final judgment. Mesaba appealed to the Eighth Circuit. On May 19, 2005, the Eighth Circuit affirmed the district court. However, the Eighth Circuit did not agree with Judge Rosenbaum that the Term Sheet was a Type I agreement. Instead, the court found that the Term Sheet was a Type II agreement. Saab I, 408 F.3d at 465. Specifically, the court stated that the Parties "entered into a Type II agreement, binding the parties to comply with the Term Sheet." Id. The court then went on to conduct a Type II analysis -- a five factor analysis that incorporates all four factors from a Type I analysis and also looks at a fifth factor, the context of the negotiations. Id. The court found that the Parties had bound themselves to

negotiate in good faith to resolve the additional terms that are "customary in such agreements." Id. at 467.

The court found that the Parties did not have a formal contract because "representations, warranties and the other standard provisions usually found in sophisticated, formal contracts" were missing. Id. at 466-67 (quotation omitted). In spite of this, the court found that the Parties intended to be bound by the terms of the Term Sheet and that, "at the very least, [Mesaba agreed] to negotiate in good faith, long-term leases for each airplane." Id. at 467. Thus, the Eighth Circuit concluded that the Term Sheet was a Type II agreement that "represented a binding preliminary commitment and obligated both sides to seek to conclude a final [agreement] upon the agreed terms by negotiating in good faith to resolve such additional terms as are customary in such agreements." Id. (quotation omitted) (bracket in original).

In August 2004, while the declaratory judgment action was on appeal, Plaintiffs filed the instant action seeking money damages for alleged breaches of the Term Sheet. Plaintiffs seek total damages in excess of $35 million. (Compl. ¶¶ 19, 24, 39.) Counts I through IV seek damages based on past due rent and rent owing on some of the leases; performance under the Term Sheet of "extended lease

terms;" and rent based on "extended lease terms." (Compl. ¶¶ 17-40.)[2] The instant action involves the rent payments for thirteen aircraft.

The Parties have engaged in limited discovery in this case. During discovery, FLI admitted that under a Type II agreement, its out-of-pocket expenses would be de minimis. (Luger Aff. ¶ 12; Ex. J, K.)

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact. Id. at 323. Summary judgment is an appropriate way to narrow issues regarding "the extent to which the amount of damages or other relief is not in controversy." Fed. R. Civ. P. 56(d).

### B. Mesaba's Motion for Summary Judgment

The Parties dispute the effect of the Eighth Circuit's opinion in this case. FLI asserts that the Eighth Circuit decided that it was entitled to benefit-of-the-bargain

---

[2]The Complaint also contains a Count V, which is not at issue in the instant motion. (Def. Mem. Supp. Mot. Summ. J. at 6 n.5.)

damages for Mesaba's breach. Mesaba responds that benefit-of-the-bargain damages are not available for breach of a Type II agreement.

The Eighth Circuit stated that "[t]he negotiations surrounding the Term Sheet and the parties' conduct lead us to conclude that [FLI] and Mesaba entered into a Type II agreement, binding the parties to comply with the Term Sheet." Saab I, 408 F.3d at 465. To support their arguments, Mesaba relies upon the court's finding that the Term Sheet was a Type II agreement, and FLI relies upon the statement that the Parties were bound to comply with the terms of the Term Sheet.

### 1. Whether the Doctrine of Collateral Estoppel Prevents FLI From Arguing that the Agreement is a Type I Agreement

Under the doctrine of collateral estoppel or issue preclusion, "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." Allen v. McCurry, 449 U.S. 90, 94 (1980); Simmons v. O'Brien, 77 F.3d 1093, 1095 (8th Cir. 1996). By precluding parties from arguing matters they already had a full and fair opportunity to litigate, the cost and vexation of subsequent lawsuits is avoided; judicial resources are conserved; and the possibility of inconsistent decisions is prevented. Id.

In the Eighth Circuit, issue preclusion applies when: (1) the party sought to be precluded was a party or in privity with a party to the prior lawsuit; (2) the issue

sought to be precluded was the same as in the prior lawsuit; (3) the issue was

actually litigated in the prior lawsuit; (4) the issue was determined by a valid and

final judgment; and (5) the determination in the prior lawsuit was essential to the

prior judgment. <u>Anderson v. Genuine Parts Co., Inc.</u>, 128 F.3d 1267, 1273 (8th Cir.

1997).

Collateral estoppel is an issue requiring the application of the law of the

forum state. <u>Baker Elec. Coop., Inc. v. Chaske</u>, 28 F.3d 1466, 1475 (8th Cir. 1994)

(citation omitted). The Restatement of Judgments states, in pertinent part, the

following:

>Effect of an appeal.
>
>                 .      .      .
>
>If the judgment of the court of first instance was based on a
>determination of two issues, either of which standing independently
>would be sufficient to support the result, and the appellate court
>upholds both of these determinations as sufficient, and accordingly
>affirms the judgment, the judgment is conclusive as to both
>determinations. . . .
>
>If the appellate court upholds one of these determinations as sufficient
>but not the other, and accordingly affirms the judgment, the judgment
>is conclusive as to the first determination.
>
>If the appellate court upholds one of these determinations as sufficient
>and refuses to consider whether or not the other is sufficient and
>accordingly affirms the judgment, the judgment is conclusive as to the
>first determination.

Restatement (Second) of Judgments § 27(o). See also McNeil v. Nat'l Football League, 790 F. Supp. 871, 891 n.24 (D. Minn. 1992); In re Welfare of M.D.O., 462 N.W.2d 370, 375 (Minn. 1990) (citing the Restatement).

FLI argues that since the Eighth Circuit affirmed the district court, it impliedly affirmed Judge Rosenbaum's determination that the lease duration dates for each aircraft were from 72 to 96 months. Therefore, FLI argues that it is entitled to damages based on those terms of the Term Sheet. FLI further asserts that even though the Eighth Circuit affirmed on only one ground -- that the Term Sheet was a Type II agreement -- it did not reverse Judge Rosenbaum's other holdings.

FLI also avers that since the Eighth Circuit stated that "at a minimum" the Parties had a Type II agreement, and since the Type I and Type II analyses are so interwoven, the addition of a fifth factor for a Type II analysis being the only difference, the Eighth Circuit actually found in FLI's favor on three of four factors for a Type I agreement and four of five factors for a Type II agreement.

The Term Sheet is a Type II agreement under New York law. The Eighth Circuit found that "[FLI] and Mesaba entered into a Type II agreement," and "[t]he Term Sheet satisfies the requirements of a Type II agreement." Saab I, 408 F.3d at 365, 367. The court specifically concluded that the Term Sheet was missing "additional terms as are customary in [Type I] agreements." Id. at 466-67. It is of no consequence that the shared Type I and Type II factors lead to the same

conclusions regardless of whether the court was conducting a Type I or Type II analysis. Furthermore, FLI's argument that the Eighth Circuit found that "at a minimum" the Term Sheet was a Type II agreement is based on a misreading of the opinion. The court actually found that the "Term Sheet satisfies the requirements of a Type II agreement; at a minimum, [the Parties] bound themselves to a framework that mandated good faith negotiations over the remaining open terms of their agreement." Id. at 367. This is not the same as finding that the Term Sheet was something other than a Type II agreement.

Not only did the Eighth Circuit definitively find that the Term Sheet was a Type II agreement, this conclusion has a preclusive effect in the current litigation: (1)  FLI was a party to the prior lawsuit; (2) the issue of whether the Term Sheet was a Type I or Type II agreement was the same as in the prior lawsuit; (3) the issue of what type of agreement the Term Sheet represented was actually litigated in the prior lawsuit; (4) the Eighth Circuit's conclusion that the Term Sheet was a Type II agreement is valid and final; and (5) the determination that the Term Sheet was a Type II agreement was essential to the prior judgment because the Term Sheet cannot be both a Type I and a Type II  agreement. See Adjustrite Sys., Inc. v. GAB Bus. Serv., Inc., 145 F.3d 543, 548 (2d Cir. 1998) (noting that Type I and Type II agreements give rise to differing obligations); Fairbrook Leasing, 295 F. Supp. 2d at 1069 (noting that parties have the right to demand performance of

Type I agreements, but may walk away from Type II agreements after making good faith efforts to finalize terms); <u>Teachers Ins. & Annuity Ass'n v. Tribune Co.</u>, 670 F. Supp. 491, 498 (S.D.N.Y. 1987) (reasoning that Type I and Type II agreements are "two distinct types" of preliminary agreements).

Moreover, under the Restatement of Judgments, the Eighth Circuit's affirmance of Judge Rosenbaum's order is conclusive only as to Judge Rosenbaum's finding that the Term Sheet was a Type II agreement. Thus, Judge Rosenbaum's alternative holding that the Term Sheet was a Type I agreement no longer has any legal effect.

In conclusion, the Eighth Circuit's determination that the Term Sheet was a Type II agreement means that the Parties were only bound to negotiate in good faith to conclude a final agreement. The Term Sheet is not a Type I agreement, and FLI is estopped from arguing that the Term Sheet is anything other than a Type II agreement.

**2. <u>Whether FLI is Entitled to Benefit-of-the-Bargain Damages for Breach of a Type II Agreement</u>**

FLI asserts that under New York law, the standard recovery for a breach of contract is that an injured party should be placed in the same position it would have been had the contract been performed.  In other words, FLI seeks benefit-of-the-bargain damages.

12

FLI further asserts that the Eighth Circuit held that it is entitled to performance of the terms of the Term Sheet. FLI bases its argument on the following statement from the Eighth Circuit's opinion: "Mesaba appeals from this judgment, arguing that the district court erred in concluding that . . . Mesaba failed to negotiate in good faith toward a final binding agreement, entitling the Lessors to performance of the terms of the Term Sheet . . . . We affirm." Saab I, 408 F.3d at 463. FLI also relies on this language: "the Lessors and Mesaba entered into a Type II agreement, binding the parties to comply with the Term Sheet." Id. at 465.

According to FLI, this statement indicates that the Eighth Circuit found that FLI was entitled to performance under the terms of the Term Sheet. For the following reasons, the Court does not agree.

Mesaba's failure to perform under the Term Sheet was a breach of the Term Sheet. The issue currently before the Court is the amount of damages to be awarded because of that breach. If a Type I agreement is breached, the injured party may demand performance of the transaction. Fairbrook Leasing, 295 F. Supp. 2d at 1069. However, such damages are not available for the breach of a Type II agreement. Tribune, 670 F. Supp. at 498. Rather, parties are free to walk away from Type II agreements once they have made a good faith effort to close the deal. Fairbrook Leasing, 295 F. Supp. 2d at 1069.

In <u>Goodstein Constr. Corp. v. New York</u>, 604 N.E.2d 1356 (N.Y. 1992), New York's highest court considered whether a developer could collect benefit-of-the-bargain damages for New York City's breach of a Type II agreement under which the parties agreed to negotiate a contract for the development of certain commercial property in the city. The parties both had obligations under the agreement – the city was obligated, among other things, to develop building plans and obtain letters of credit, and the developer was obligated to secure certain legal and financial guarantees.  In addition, the city retained the exclusive right to terminate negotiations at any time. The city breached approximately eighteen months after the agreement was signed, and the developer sued for benefit-of-the-bargain damages. No permanent development contract was ever signed.

The court framed the issue as "whether plaintiff . . . can have a valid claim for loss of its expectancy based upon the City's anticipated performance of the obligations it would have undertaken assuming that the negotiations had progressed to agreement." <u>Goodstein</u>, 604 N.E.2d at 1360. The court held that "both law and logic" precluded such a recovery. <u>Id.</u> The court reasoned that allowing such a recovery would amount to turning the Type II agreement to negotiate into the final binding contract the parties were working towards. <u>Id.</u> Moreover, awarding such damages would have the undesirable effect of allowing the developer to collect profits from a development he never had to build. <u>Id.</u> at

14

1361. Concluding that it was not conceivable that the city ever contemplated that it was entering into a contract that contained such a one-sided allocation of risks, the Court reversed the appellate court, and refused to award damages. Id. at 1362.

FLI argues that the instant case is distinguishable from Goodstein because in this case the Eighth Circuit specifically found that the Parties had a binding commitment and that the evidence demonstrated that there had been prolonged, even complete, performance, even in the absence of final documents. FLI further points out that the damages it seeks are different from the damages the developer sought in Goodstein. Specifically, while the developer sought future hypothetical damages, FLI seeks easily determinable monthly rents.

The Court finds that Goodstein controls. Goodstein is the most recent decision from the highest court in New York and does not create an exception for unpaid rent damages as opposed to other damages. In addition, two federal courts agree that Goodstein stands for the rule that benefit-of-the-bargain damages are not allowed for breaches of Type II agreements. See Westerbeke Corp. v. Daihatsu Motor Co., Ltd., 304 F.3d 200, 206 (2d Cir. 2002) (stating that Goodstein "prohibits the award of expectancy damages for the breach of a preliminary agreement"); Gorodensky v. Mitsubishi Pulp Sales (MC), Inc., 92 F. Supp. 2d 249, 255 n.2 (S.D.N.Y. 2000) (citing Goodstein for the rule that lost future profits are unavailable for breach of a duty to negotiate in good faith).

Although FLI is correct that the damages sought in <u>Goodstein</u> were much more speculative than the damages it seeks, the amount of damages does not control. The type of agreement controls. If it did not, there would be no reason to differentiate between Type I and Type II agreements. New York has chosen to create such a distinction, and the distinction not only applies to the difference between an agreement to negotiate as opposed to an agreement to perform under a final contract, but also applies to the type of damages available.

The cases cited by FLI can be distinguished. <u>Teachers  Ins. & Annuity Ass'n v. Butler</u>, 626 F. Supp. 1229 (S.D.N.Y. 1986) ("<u>Butler</u>") and <u>Teachers Ins. & Annuity Ass'n v. Tribune Co.</u>, 670 F. Supp. 491 (S.D.N.Y. 1987) ("<u>Tribune</u>") involved disputes over the terms of Type II financing agreements. Although FLI argues that these cases support its contention that benefit-of-the-bargain damages are available for the breach of Type II agreements, the cases do not stand for that proposition. <u>Butler</u> turned on contract language providing for benefit-of-the-bargain damages for any breach. <u>Butler</u>, 626 F. Supp. at 1236. The court never even mentioned the terms "Type I" or "Type II."  Although the court acknowledged boilerplate contract damages language allowing for benefit-of-the-bargain damages, the court never referred to the "type" of agreement it was analyzing. Thus, <u>Butler</u> is irrelevant to this discussion.

CASE 0:04-cv-03791-MJD-JJG   Document 49   Filed 07/06/06   Page 17 of 19

Likewise, <u>Tribune</u> has no relevance to the instant case because although the
<u>Tribune</u> court found that the agreement at issue was a Type II agreement, the court
made no findings regarding appropriate damages.[3] <u>Tribune</u>, 670 F. Supp. at 508.
The <u>Tribune</u> court did state, however, that when a Type II agreement is breached,
the aggrieved party may not seek performance of the contract. <u>Id.</u> at 498. Thus,
<u>Tribune</u> is not helpful to FLI.

Similarly, <u>Cauff, Lippman & Co. v. Apogee Fin. Group, Inc.</u>, 807 F. Supp.
1007 (S.D.N.Y. 1992) is also not instructive. <u>Cauff, Lippman</u> involved the breach of
a preliminary agreement to deliver airplanes. The defendant refused to finalize the
deal unless the plaintiffs agreed to reduce the profits they contracted for in the
preliminary agreement. The court found that the defendants had not only breached,
but also that they had prevented conditions precedent from occurring. The court
awarded benefit-of-the-bargain damages to the plaintiffs. <u>Cauff, Lippman</u>, 807 F.
Supp. at 1024.

Although at one point the <u>Cauff, Lippman</u> court called the agreement at issue
"an agreement to negotiate in good faith," <u>id.</u> at 1021, the court actually considered

---

[3] The <u>Tribune</u> court did not use the term "Type II agreement." Rather, it labeled this
type of agreement a "preliminary binding agreement," and called the specific
document at issue in the case a "commitment letter." <u>Tribune</u>, 670 F. Supp. at 498-
99.

17

the agreement a contract subject to conditions precedent.[4] Id. at 1021-24.

Moreover, Cauff, Lippman was decided prior to Goodstein. Accordingly, Cauff, Lippman is not relevant to the instant case.

In Teachers Ins. & Annuity Ass'n v. Ormesa Geothermal, 791 F. Supp. 401 (S.D.N.Y. 1991) ("Ormesa"), the court analyzed a Type II commitment agreement regarding funds to build a power plant. The court found that the defendant breached the commitment agreement by refusing to adhere to its terms once interest rates fell so far that it was cheaper to defend a lawsuit than to perform under a final contract. The Ormesa court awarded the plaintiff the difference between the interest income plaintiff would have earned had there been no breach and the interest the plaintiff would have earned by timely mitigating its damages by making a similar investment at the time of the breach. 791 F. Supp. at 416-17.

Although Ormesa has not specifically been overruled or reversed, it was decided prior to Goodstein. Goodstein was decided by New York's highest court. The federal courts sitting in diversity must follow the rulings of a state's highest court concerning matters of state law. Swope v. Siegel-Robert, Inc., 243 F.3d 486, 496 (8th Cir. 2001) (citation omitted). On this issue, Goodstein is that ruling. Thus,

---

[4] The Second Circuit agrees that Cauff, Lippman involved a contract subject to conditions precedent. Westerbeke, 304 F.3d at 206 n.3.

18

benefit-of-the-bargain damages are not available to FLI, and its damages are only de minimus. Accordingly, Mesaba's motion for summary judgment is granted.

    **C.**    **FLI's Motion for Partial Summary Judgment on Counts I & II**

Based on the above discussion and conclusions, FLI's motion is denied.


Based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

(1) Plaintiffs' Motion for Summary Judgment on Counts I and II [Doc. No. 26] is **DENIED**;

(2) Defendant's Motion for Partial Summary Judgment [Doc. No. 19] is **GRANTED**; and

(3) Counts I, II, III, and IV of the Complaint are **DISMISSED WITH PREJUDICE**.


Dated: July 6, 2006

s / Michael J. Davis
Michael J. Davis
United States District Court